# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2022-NMSC-017

Filing Date: July 14, 2022

No. S-1-SC-38418

**STATE OF NEW MEXICO,**

Plaintiff Petitioner,

v.

**OLIVER TSOSIE, a/k/a**
**OLIVER O. TSOSIE, a/k/a**
**OLIVER OLIN TSOSIE,**

Defendant Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Alisa A. Hart, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Santa Fe, NM

for Respondent

## OPINION

**BACON, Chief Justice.**

**{1}** This case requires that we apply evolving Confrontation Clause jurisprudence following *Crawford v. Washington*, 541 U.S. 36 (2004), to statements made by an alleged victim, now unavailable, in the course of a sexual assault nurse examiner (SANE) exam. On interlocutory appeal, the State challenges the Court of Appeals' affirmance of the district court's pretrial ruling that almost all statements made by Declarant Kimbro Talk to SANE nurse Gail Starr were inadmissible as violating Defendant Oliver Tsosie's confrontation rights under the Sixth Amendment. The district court concluded that Declarant's statements sought by the State for use at Defendant's trial were testimonial in nature, and thus inadmissible, pursuant to *Crawford* and *Davis*

*v. Washington*, 547 U.S. 813 (2006). We reverse and, without ruling on other considerations of admissibility, hold that almost all of the excluded statements are nontestimonial in nature and thus do not violate Defendant's rights under the Confrontation Clause.

## I.      BACKGROUND

## A.      Factual Background

**{2}**      Based on events on or about December 18, 2017, Defendant was charged with kidnapping, criminal sexual penetration, aggravated burglary, aggravated battery, aggravated assault, and bribery of a witness. The State's allegations included that Declarant argued with Defendant after admitting Defendant and an unknown male into his apartment. Defendant allegedly held a knife from Declarant's kitchen to Declarant's throat, struck and kicked Declarant, and then strangled Declarant to unconsciousness. Upon regaining consciousness, Declarant allegedly was restrained on the floor by the unknown male while Defendant was anally penetrating Declarant with his penis. Defendant and the unknown male allegedly tied up Declarant and then stole some of his belongings. Before leaving, Defendant allegedly threatened to return with the unknown male to kill Declarant if he reported the events to police. Declarant subsequently freed himself and called 911 from his neighbor's apartment.

**{3}**      Following treatment that night at the University of New Mexico Hospital (UNMH) emergency room, Declarant was referred for additional examination and treatment by the SANE department. Declarant was transported by law enforcement to the Family Advocacy Center where he underwent the SANE examination conducted by Starr. The eighteen-page SANE exam report in which Starr recorded Declarant's statements was admitted as State's Exhibit 3 ("SANE exam report") at a motion hearing on October 9, 2018.

**{4}**      Because Declarant died in June 2018, he is unavailable to testify, and the record offers no evidence that Defendant had an opportunity to cross-examine Declarant regarding his statements recorded in the SANE exam report.

## B.      Procedural Background

**{5}**      Following a pretrial hearing regarding various evidentiary issues, the district court concluded that it required testimony from Starr before making a determination about the admissibility of Declarant's statements in the SANE exam report. Accordingly, the district court held a hearing for that purpose.

**{6}**      At the hearing, Starr was qualified as an expert in the area of sexual assault nurse examinations. Starr's testimony included the purpose of a SANE exam generally:

> [W]e are a medical exam. It's very important to treat somebody who has been a victim of trauma . . . to give them support and psychosocial support . . . to do a safety assessment, make sure they're not at risk for re-offense,

re-harm . . . to give them medications to prevent sexually transmitted diseases, to help their body and help them feel . . . less dirty . . . to give them resources to assist them to heal. We also do forensic photography . . . and . . . for sexual assault, we also do the sexual assault evidence kit as a part of the exam, as well.

Starr testified as to her specialized training as a SANE nurse, her limited ability to make a nursing diagnosis rather than a physician's medical diagnosis, and the circumstances of the SANE program's medical clinic. Starr also testified at length as to the underlying purposes of each portion of the SANE exam report the State sought to admit in the instant case. We include this testimony below where it is relevant to the analysis.

### 1. The district court's order regarding admissibility of statements in the SANE exam report

**{7}** Central to this appeal, the district court issued an order recounting Starr's hearing testimony. The order specified statements within nine portions of the SANE exam report which the State intended to elicit at trial through Starr's testimony. Then, the court set forth a testimonial analysis under *Crawford*, stated as findings of fact and conclusions of law. The court's order admitted four statements made in the SANE exam that had "an ascertainable purpose that was primarily for medical treatment." Eight portions of the SANE exam report were ruled inadmissible—challenged here by the State—due to those statements "not [being] made for the primary purpose of seeking medical treatment and [being] testimonial hearsay and a violation of Defendant's right to confrontation."

**{8}** Starr's testimony as recounted in the order included that she "has received specialized training to assess genital injuries and injuries caused by strangulation" and that "[a]s a SANE nurse, she can treat but cannot diagnose a patient." The order noted Starr's testimony that the SANE clinic "is located in the same building" as law enforcement "but in a separate area" and that Declarant "was brought to the clinic by law enforcement." The order also noted that "[a] CT scan of [Declarant] was conducted by UNMH prior" to the SANE exam. It further noted that "[a] SANE examination will be performed regardless of whether the patient reports the assault to law enforcement." The order included a nonexclusive list from Starr's testimony as to underlying medical purposes for Declarant's statements sought by the State for use at trial.

**{9}** For legal authorities guiding its analysis, the district court quoted portions of *State v. Romero* regarding testimonial analysis. *See Romero*, 2007-NMSC-013, ¶ 7, 141 N.M. 403, 156 P.3d 694 ("'Statements are . . . *testimonial* when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" (quoting *Davis*, 547 U.S. at 822)); *id.* ¶ 21 ("[T]he level of formality of the interrogation is a key factor in determining whether statements are 'testimonial' within the meaning of *Crawford*." (citing *Davis*, 547 U.S. at 830)). The district court also cited *State v. Largo* for the proposition that "[t]he actions and statements of both the interrogator and the declarant may illuminate the *primary* purpose of the interrogation."

*See* 2012-NMSC-015, ¶ 16, 278 P.3d 532. The district court did not cite United States Supreme Court confrontation jurisprudence subsequent to *Davis*.

**{10}** The district court set out six findings of fact. These findings provided that "[t]he examination occurred in a structured setting," that the SANE exam report's multiple "forms suggest[ed] structured questioning," that Declarant "consent[ed] to release all records and evidence to law enforcement," that Declarant "had been seen and treated at UNMH emergency room prior to" the SANE exam, that "[a]lthough [Declarant had been] seen at UNMH and received a CT scan, genital examinations are referred to [the] SANE" program, and that "[a]lthough there is a dual purpose in a SANE examination, including a medical evaluation and police investigation, the majority of statements by [Declarant] recount[ed] what the abusers did, who did it, and what [Declarant] did that might affect collection of evidence in the *Post-Assault Hygiene Activity* section of the structured [SANE exam report] form" on page 3.

**{11}** The order's analysis then set out four apparent legal conclusions:

[1] The primary purpose of a majority of the examination by the SANE nurse was not for medical treatment of [Declarant] but for purposes of forensic investigation, collection of physical evidence, and to ascertain the identity of the assailants.

[2] Other than the genital examination, the primary purpose of the SANE examination was to prove some past fact for use in criminal trial rather than to meet an ongoing emergency making the majority of [Declarant's] statements to the SANE nurse testimonial in nature.

[3] Viewed objectively, the majority of statements given to the SANE nurse were not given for the primary purpose of medical diagnosis. The SANE nurse testified she is not able to make a diagnosis. [Declarant] had already been seen at UNMH and there was no indication that UNMH lacked necessary medical equipment for proper medical examination, diagnosis, and treatment.

[4] Because the SANE nurse receives specialized training in assessing genital injuries and it is not uncommon for a SANE nurse to receive a referral from emergency rooms for genital examinations, limited statements made by [Declarant] to the SANE nurse would qualify as nontestimonial hearsay falling under the exception in Rule 11-803(4) [NMRA].

**{12}** The district court's order then set out the four statement categories ruled both as admissible under the Confrontation Clause and as exceptions to hearsay, accompanied by the court's reasoning. Declarant's statements regarding not having prior genital symptoms were admitted, because "[a]lthough [Declarant] had been seen at UNMH prior to the SANE exam, [Declarant] was referred to [the] SANE [program] for the genital exam." Declarant's statements were admitted regarding both "penile penetration of the

anus and ejaculation inside a body orifice." The former statement was admitted regarding "[t]he [bodily] location of penetration and the object used" because, "[a]lthough it is a statement of a past event," Declarant "had been referred for a genital examination that was being conducted by" Starr. The latter statement was admitted because Starr "testified that this question is asked to address a concern about illness and disease, making the primary purpose for this statement for medical treatment." Finally, Declarant's statements describing his pain and the level of pain were admitted, because neither statement regarded past events and both "directly relate[d] to [Declarant's] medical treatment."

{13}   The district court's order ruled statements in eight portions of the SANE exam report inadmissible under the Confrontation Clause:

    a.      Statements regarding consent for services [in the page 1] *Albuquerque SANE Collaborative Exam Consent Form*.

    b.      Statements contained in the top portion of the [page 2] *Sexual Assault Intake* form.

    c.      Statements contained in the page 3 [*History* form,] . . . except for the statement that [Declarant] had no prior genital symptoms prior to the assault.

    d.      Statements contained in [the] page 5 . . . *Strangulation Documentation*. The State seeks to introduce the statements of [Declarant] describing method and manner of strangulation. Although[] [Starr] has specialized training in injuries caused by strangulation, objectively, the primary purpose of these structured questions [is] not for medical treatment and focus[es] on past events, not current symptoms.

    e.      Statements contained in [the] page 7 . . . *Patient Narrative*.

    f.      Statements contained in [the] page 8 . . . *Acts Described by Patient* . . . except . . . penile penetration of the anus and ejaculation inside a body orifice.

    g.      Statements contained in [the] page 9 . . . *Physical Exam* . . . except for the description of [Declarant's] level of pain.

    h.      Statements contained [in the page] 11 . . . *Body Map – Physical Exam/Assessment* [that explain how the injuries noted on the page 10 *SANE Body Map* occurred].[1]

---

[1]We note that the fourth and fifth actual pages of the SANE exam report were not numbered in the document's numbering sequence at the bottom left margin, leading to the sixth actual page being identified at its bottom left margin as "Page 4 of 13," and all subsequent pages being numbered correspondingly. In accordance with the district court's order, we refer to each page by the sequence number of the actual page.

These constitute the statements challenged by the State before this Court.

**2.      The Court of Appeals' opinion**

**{14}**    In a memorandum opinion, the Court of Appeals agreed with the district court that admission of the challenged statements would violate Defendant's Sixth Amendment right to confrontation. *State v. Tsosie*, A-1-CA-37791, mem. op. ¶ 1 (N.M. Ct. App. July 21, 2020) (nonprecedential).

**{15}**    For its legal framework, the Court of Appeals relied on the seven principles we articulated in *State v. Navarette*, 2013-NMSC-003, ¶¶ 7-13, 294 P.3d 435, as "'essential' to an analysis under the Confrontation Clause." *Tsosie*, A-1-CA-37791, mem. op. ¶ 13 (quoting *Navarette*, 2013-NMSC-003, ¶ 7 (citing *Crawford*, 541 U.S. at 36)). Relevant here is the second *Navarette* principle that "'a statement can only be testimonial if the declarant made the statement primarily intending to establish some fact with the understanding that the statement may be used in a criminal prosecution.'" *Id.* (quoting *Navarette*, 2013-NMSC-003, ¶ 8). The Court also cited, among others, *Ohio v. Clark*, 576 U.S. 237, 249 (2015), and *State v. Mendez*, 2010-NMSC-044, ¶ 29, 148 N.M. 761, 242 P.3d 328. *Tsosie*, A-1-CA-37791, mem. op. ¶ 13. The Court concluded from the foregoing authorities that it should apply "a totality of the circumstances approach: interpreting the testimonial nature of each statement individually, guided by the circumstances in which it was made, and evaluating both the intent of the declarant and the interviewer." *Tsosie*, A-1-CA-37791, mem. op. ¶ 14.

**{16}**    The Court of Appeals rejected the State's argument that a SANE nurse's questioning is sufficiently distinct from a law enforcement officer's "'interrogat[ion]'" to preclude the primary purpose of a SANE exam being "'to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* ¶ 15 (quoting *Davis*, 547 U.S. at 822). The Court agreed that a SANE nurse is "'not principally charged with uncovering and prosecuting criminal behavior,'" *id.* (quoting *Clark*, 576 U.S. at 249), but cited their "'dual role'" against a presumption that statements made to a SANE nurse must be nontestimonial, *id.* (quoting *Mendez*, 2010-NMSC-044, ¶ 42).

**{17}**    Analyzing the surrounding circumstances, the Court of Appeals concluded "that [Declarant] understood that at least some of his statements would be used to prosecute Defendant." *Id.* ¶ 16. The key circumstances considered in the Court's analysis were that Declarant "was taken . . . by law enforcement" to the SANE exam, "was asked in detail about the assault during the examination, was asked to provide forensic genital and anal swabs, and consented to the release of information to law enforcement." *Id.* ¶ 16.

**{18}**    Applying its analysis above "to each individual statement," the Court of Appeals held that Declarant's "narrative account of the encounter" and his "description of the method and manner of strangulation" are "testimonial in that [they] identif[y] Defendant and accuse[] him of specific acts." *Id.* ¶ 17. The Court also held that "the remaining statements the district court excluded are testimonial because they focus on past events rather than current symptoms." *Id.*

**{19}** Finally, the Court of Appeals rejected the State's argument that, based on the district court's failure to indicate its rejection of uncontradicted evidence, the district court disregarded Starr's uncontradicted testimony. *Id.* ¶ 18 n.1. The Court stated that "[i]n cases such as this where a district court does not explicitly make any findings regarding the credibility of a witness, '[a]ll reasonable inferences in support of the district court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded.'" *Id.* (quoting *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856).

**{20}** Pursuant to the State's petition in compliance with Rule 12-502 NMRA, we issued a writ of certiorari to review this case. On appeal to this Court, the State advances three primary arguments in support of the admissibility of the challenged statements. First, no prior New Mexico law governs here, thus rendering admissibility of statements to the SANE nurse in this case an issue of first impression. Second, a trend in confrontation caselaw from other jurisdictions supports the admissibility of statements made in the course of a SANE exam. Third, the district court and the Court of Appeals in this case improperly disregarded Starr's uncontradicted testimony concerning the primary purpose of the SANE exam.

## II.    DISCUSSION

**{21}** Because *Crawford* fundamentally altered Confrontation Clause jurisprudence regarding the admissibility of statements made by unavailable declarants, we first discuss relevant admissibility standards developed under *Crawford* and its progeny. Because the United States Supreme Court has not applied those standards to statements made in the course of a SANE exam, we turn also to New Mexico caselaw, which is consistent with *Crawford* and its progeny. Finally, we apply these considerations to the instant case and analyze the rulings of the courts below.

**{22}** We note as a preliminary matter that constitutional confrontation analysis is merely the threshold consideration for admissibility in this circumstance. *Cf. State v. Attaway*, 1994-NMSC-011, ¶ 8, 117 N.M. 141, 870 P.2d 103 (recognizing "threshold constitutional issues" that require determination before other considerations). The admissibility of any statement that survives confrontation analysis remains subject to state and federal rules of evidence, including hearsay and balancing of probative value versus prejudicial effect. *See Michigan v. Bryant*, 562 U.S. 344, 370 n.13, 378 (2011); *cf. Mendez*, 2010-NMSC-044, ¶ 28 ("The hearsay rule and the Confrontation Clause are not co-extensive and must remain distinct."); *Giles v. California*, 554 U.S. 353, 376 (2008) (distinguishing between Confrontation Clause analysis and state law considerations).

## A.    Standard of Review

**{23}** "[W]hether out-of-court statements are admissible under the Confrontation Clause is a question of law, subject to de novo review." *Largo*, 2012-NMSC-015, ¶ 9; *State v. Lasner*, 2000-NMSC-038, ¶ 24, 129 N.M. 806, 14 P.3d 1282.

**B.      The Confrontation Clause Under *Crawford* and Its Progeny**

*1.      Crawford v. Washington*

**{24}**    The Confrontation Clause of the Sixth Amendment to the United States Constitution, binding on the states through the Fourteenth Amendment, provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amends. VI, XIV; *Bryant*, 562 U.S. at 352; *Clark*, 576 U.S. at 243. Under the Confrontation Clause standard announced in *Crawford*, "'witnesses' . . . are those 'who bear testimony,' and [*Crawford*] defined 'testimony' as 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Clark*, 576 U.S. at 243 (quoting *Crawford*, 541 U.S. at 51). "The Sixth Amendment . . . prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Id.* (quoting *Crawford*, 541 U.S. at 54); *accord Navarette*, 2013-NMSC-003, ¶ 7. Under *Crawford* and its progeny, "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Clark*, 576 U.S. at 245.

**{25}**    Examining the historical background of the Confrontation Clause, the *Crawford* Court identified "testimonial hearsay" as the "primary object" of the Sixth Amendment, 541 U.S. at 53, and identified "*ex parte* examinations as evidence against the accused" as "the principal evil at which the Confrontation Clause was directed," *id.* at 50. The *Crawford* Court "noted that in England, pretrial examinations of suspects and witnesses by government officials 'were sometimes read in court in lieu of live testimony.'" *Bryant*, 562 U.S. at 353 (quoting *Crawford*, 541 U.S. at 43). Such pre-Constitutional ex parte examinations were conducted by justices of the peace who "had an essentially investigative and prosecutorial function." *Crawford*, 541 U.S. at 53. Such "investigative functions [are] now associated primarily with the police," and today "[t]he involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace." *Id.*

**{26}**    "*Crawford* did not offer an exhaustive definition of 'testimonial' statements [but] . . . stated that the label 'applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.'" *Clark*, 576 U.S. at 243-44 (quoting *Crawford*, 541 U.S. at 68). "These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford*, 541 U.S. at 68. Accordingly, the statements in question in *Crawford*—made in the course of a station house police interrogation—were ruled testimonial and thus inadmissible under the Confrontation Clause. *Id.* at 61, 65, 68. "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard," *Crawford*, 541 U.S. at 52, where such "interrogations [are] solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator," *Davis*, 547 U.S. at 826 (stating that the *Crawford* Court "had [such interrogations] immediately in mind (for that was the case before us)").

### 2.    *Davis v. Washington* and *Hammon v. Indiana*

**{27}**    In *Davis*, the United States Supreme Court addressed two domestic violence cases (*Davis v. Washington*, No. 05-5224 and *Hammon v. Indiana*, No. 05-5705) in a single opinion. In doing so, the United States Supreme Court "took a further step to 'determine more precisely which police interrogations produce testimony' and therefore implicate a Confrontation Clause bar." *Bryant*, 562 U.S. at 354 (quoting *Davis*, 547 U.S. at 822). The *Davis* Court considered the testimonial nature of the *Davis* declarant's statements that specified the identity and continuing assaultive actions of her former boyfriend to a 911 operator deemed an "agent[] of law enforcement." 547 U.S. at 817-18, 823 n.2. Concurrently, the *Davis* Court considered the testimonial nature of the *Hammon* declarant's statements that specified her husband's earlier-occurring violent actions to a police officer taking notes while another officer required her husband to remain in a separate room. *Id.* at 819-20.

**{28}**    Applying *Crawford* to these disparate factual circumstances, the *Davis* Court announced what has become known as the "primary purpose" test:

> Statements are *nontestimonial* when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are *testimonial* when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the [police] interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822 (emphasis added);[2] *Clark*, 576 U.S. at 244. The *Davis* Court made clear that these primary purpose conclusions were a sufficient approach for both *Davis* and *Hammon* "[w]ithout attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial." *Davis*, 547 U.S. at 822. However, other than providing the key factors underlying the *Davis* and *Hammon* holdings, the *Davis* Court did not further define the testimonial nature of statements falling outside those cases' factual circumstances.

**{29}**    In *Davis*, the key factors rendering the statements to police nontestimonial, and thus in harmony with the Confrontation Clause, included that the victim "was speaking about events *as they were actually happening*, rather than describing past events, that there was an ongoing emergency, that the elicited statements were necessary to be able to *resolve* the present emergency, and that the statements were not formal."

---

[2]We note that some courts, including the district court in this case, quote the second sentence of this *Davis* excerpt in isolation, without acknowledgement that "*Davis* confined its discussion of interrogation to situations involving law enforcement officers and their agents." *Romero*, 2007-NMSC-013, ¶ 7; *see Bryant*, 562 U.S. at 354 (quoting *Davis*, 547 U.S. at 822). By recognizing that the holding in *Davis* focused on police interrogation, however, we do not suggest that the principles of testimonial analysis in *Davis* must be applied *only* to police interrogations. *See Davis*, 547 U.S. at 822 ("[T]hese cases require us to determine more precisely which police interrogations produce testimony.").

*Bryant*, 562 U.S. at 356-57 (text only) (citation omitted).[3] The *Davis* Court noted that "a 911 call[] is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Davis*, 547 U.S. at 827 (second and third alterations in original).

**{30}** In *Hammon*, the following were key factors rendering the statements to police testimonial and thus in violation of the Confrontation Clause:

> There was no emergency in progress. The officer questioning [the declarant] was not seeking to determine what is happening, but rather what happened. It was formal enough that the police interrogated [the declarant] in a room separate from her husband where, some time after the events described were over, she deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed.

*Bryant*, 562 U.S. at 357 (ellipsis, internal quotation marks, and citation omitted).

**{31}** *Davis* contemplated that a police "interrogation to determine the need for emergency assistance" could "evolve into testimonial statements once that purpose has been achieved." *Davis*, 547 U.S. at 828 (internal quotation marks and citation omitted). The *Davis* Court recognized that "after the [911] operator gained the information needed to address the exigency of the moment," answers to the operator's subsequent questions may have become testimonial. *Id.* at 828-29. The Court advised,

> This presents no great problem. . . . [T]rial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.

*Id.* at 829; *see Bryant*, 562 U.S. at 365 n.10 (affirming *Davis*'s recognition of "the evolutionary potential of a situation in . . . the Confrontation Clause context").

### 3. *Michigan v. Bryant*

**{32}** In *Bryant*, five years after *Davis*, the United States Supreme Court further expounded on the primary purpose test, directing that "when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." 562 U.S. at 370 (quoting *Davis*, 547 U.S. at 822).

---

[3]The "text only" parenthetical used herein indicates the omission of any of the following——internal quotation marks, ellipses, and brackets——that are present in the text of the quoted source, leaving the quoted text itself otherwise unchanged.

*Bryant* specified that a court conducting this objective inquiry should "beg[i]n its analysis with the circumstances in which" the parties interacted, *id.* at 362, then conduct "a combined inquiry that accounts for [the statements and actions of] both the declarant and the interrogator," *id.* at 367.[4] As we discuss below, the *Bryant* Court applied these principles to the victim's statements to police officers who discovered him in a gas station parking lot mortally wounded by a gunshot. *Id.* at 370-78. Despite identifying and describing the shooter and the location of the shooting, the statements of the declarant were held to be nontestimonial, and their admission in the defendant's trial, therefore, did not violate the Confrontation Clause. *Id.* at 377-78.

**{33}** Noting that *Davis* did not define "'ongoing emergency,'" *id.* at 363, the *Bryant* Court analyzed that factor at length, *id.* at 359-78, as "among the most important circumstances informing the 'primary purpose' of an interrogation" "between an individual and the police," *id.* at 361 (quoting *Davis*, 547 U.S. at 828-30) (citing *Crawford*, 541 U.S. at 65). The *Bryant* Court stated that "[w]hen, as in *Davis*, the primary purpose of an interrogation is to respond to an ongoing emergency, its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause." *Id.* at 358 (internal quotation marks omitted). "The existence of an ongoing emergency . . . focuses the participants on something other than 'proving past events potentially relevant to later criminal prosecution.' Rather, it focuses them on 'ending a threatening situation.'" *Id.* at 361 (brackets, footnote, and citation omitted) (quoting *Davis*, 547 U.S. at 822, 832).[5]

**{34}** In overturning the ruling of the Michigan Supreme Court that statements of the declarant were testimonial, the *Bryant* Court stated that the Michigan Supreme Court, under its misreading of *Davis*, "failed to appreciate that whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 363. The *Bryant* Court cautioned against "employ[ing] an unduly narrow understanding of ongoing emergency that *Davis* does not require." *Id.* at 362 (internal quotation marks omitted).

**{35}** The *Bryant* Court further cautioned that its

---

4We note that the *Bryant* Court considered the responding officers' subsequent testimony in its objective inquiry. 562 U.S. at 372-73, 375, 377. Contrary to the dissent's suggestion, *dissent* ¶ 155, consideration of such testimony from the participants does not render the inquiry subjective, as we discuss further below.

5Regarding the importance of emergency to the testimonial inquiry, we note that elsewhere *Bryant* equated "[t]he existence of an emergency" with "*parties' perception* that an emergency is ongoing." 562 U.S. at 370 (emphasis added). The Court also stated,

> The existence of an ongoing emergency *must be objectively assessed from the perspective of the parties to the interrogation at the time*, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause. The emergency is relevant to the primary purpose of the interrogation because of the effect it has on the parties' purpose, not because of its actual existence.

*Id.* at 361 n.8 (emphasis added) (internal quotation marks omitted).

discussion of the Michigan Supreme Court's misunderstanding . . . should not be taken to imply that the existence *vel non* of an ongoing emergency is dispositive of the testimonial inquiry. As *Davis* made clear, whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the primary purpose of an interrogation.

*Id.* at 366 (internal quotation marks omitted). Additionally, the Court noted that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 358. Moreover, in determining whether a statement is testimonial, "standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Id.*

**{36}** In arriving at its testimonial ruling, the *Bryant* Court emphasized that the primary purpose "inquiry is objective." *Id.* at 360 ("*Davis* uses the word 'objective' or 'objectively' no fewer than eight times in describing the relevant inquiry."). The Court noted that the objective test applies even to determining the purposes of a severely injured victim in making statements to police. *Id.* at 368-69. "The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim—circumstances that prominently include the victim's physical state." *Id.* at 369. Under the circumstances in *Bryant*, including the ongoing emergency and need for medical treatment, the Court could not "say that a person in the [the victim's] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* at 375 (quoting *Davis*, 547 U.S. at 822).

**{37}** In relation to its ongoing emergency analysis, *Bryant* also addressed the relative "importance of *informality* in an encounter between a victim and police." *Id.* at 366. The Court noted that "although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is" testimonial, "informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." *Id.* (citing *Davis*, 547 U.S. at 822, 826). The informality of the parking lot police interrogation in *Bryant*, however, made that case "distinguishable from the formal station-house interrogation in *Crawford*" and weighed toward the Court's nontestimonial ruling. *Id.* at 366.

**{38}** Under the foregoing analysis of the encounter's circumstances, the *Bryant* Court then conducted its inquiry into the statements and actions of the parties to the encounter. *Id.* at 367-68. "*Davis* requires a combined inquiry that accounts for both the declarant and the interrogator," as "the contents of both the questions and the answers" are relevant to ascertaining the primary purpose. *Id.* at 367-68. The Court stated that such a "combined approach also ameliorates problems that could arise from looking solely to one participant," such as "the problem of mixed motives on the part of both interrogators and declarants." *Id.* at 368. Police officers' "dual responsibilities" "as both first responders and criminal investigators . . . may mean that they act with different motives simultaneously or in quick succession." *Id.* Similarly, "[v]ictims are also likely to have mixed motives when they make statements to the police . . . [or] may have no

purpose at all in answering questions posed." *Id.* at 368-69. "[C]ourts making a primary purpose assessment should not be unjustifiably restrained from consulting all relevant information, including the statements and actions of interrogators." *Id.* at 369-70.

{39}  Under this combined approach, the statements and actions of the gunshot victim and the law enforcement officers in *Bryant* supported the conclusion that "the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency." *Id.* at 378 (internal quotation marks and citation omitted). The injured declarant "was obviously in considerable pain and had difficulty breathing and talking" but answered police questions and asked when medical services would arrive. *Id.* at 375. "The questions [police] asked—what had happened, who had shot him, and where the shooting had occurred—were the exact type of questions necessary to allow the police to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Id.* at 376 (internal quotation marks and citations omitted). "In other words, they solicited the information necessary to enable them 'to meet an ongoing emergency.'" *Id.* (quoting *Davis*, 547 U.S. at 822). Weighing the "circumstances of the encounter," the *Bryant* Court held the challenged statements to law enforcement to be nontestimonial. *Id.* at 377-78.

### 4.  *Ohio v. Clark*

{40}  The United States Supreme Court applied and refined the primary purpose test next in *Clark*, four years after *Bryant*. In *Clark*, a three-year-old victim's statements to his preschool teachers that identified the child's adult assailant were ruled nontestimonial under the primary purpose test. 576 U.S. at 240. Because of the interrogators' identity as teachers, the *Clark* Court addressed for the first time a question the United States Supreme Court had "repeatedly reserved: whether statements to persons other than law enforcement officers are subject to the Confrontation Clause." *Id.* at 246; *cf. Davis*, 547 U.S. at 823 n.2 (considering 911 operators' interrogations of 911 callers as "acts of the police"); *Bryant*, 562 U.S. at 357 n.3 (same). The Court "decline[d] to adopt a categorical rule excluding [such statements] from the Sixth Amendment's reach" but stated that "such statements are much less likely to be testimonial than statements to law enforcement officers." *Clark*, 576 U.S. at 246. "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'create an out-of-court substitute for trial testimony.'" *Id.* at 245 (brackets omitted) (quoting *Bryant*, 562 U.S. at 358).

{41}  Following *Bryant*, the *Clark* Court objectively evaluated the surrounding circumstances of the encounter and the statements and actions of the parties. *Id.* at 246-49; *see Bryant*, 562 U.S. at 359. Based on the victim's visible injuries, "the teachers needed to know whether it was safe to release [the child] to his guardian at the end of the day, [and thus] they needed to determine who might be abusing the child." *Clark*, 576 U.S. at 246. The Court noted, "As in *Bryant*, the emergency in this case was ongoing, and the circumstances were not entirely clear. [The] teachers were not sure who had abused him[,] . . . how best to secure his safety[, and] . . . whether any other children might be at risk." *Id.* at 247. The Court determined that the teachers' questions

and the victim's answers "were primarily aimed at identifying and ending the threat." *Id.* Additionally, the Court noted that the conversation between the parties "was informal and spontaneous . . . in the informal setting of a preschool lunchroom and classroom, and [thus] . . . nothing like the formalized station-house questioning in *Crawford* or the police interrogation and battery affidavit in *Hammon*." *Id.*

**{42}** Concluding its testimonial analysis, the *Clark* Court reiterated that the questioners being "individuals who are not law enforcement officers . . . remains highly relevant" to Sixth Amendment analysis. *Id.* at 249. Citing *Bryant*, 562 U.S. at 369, the Court noted a "questioner's identity" as part of the context in which statements must be evaluated when challenged under the Confrontation Clause. *Clark*, 576 U.S. at 249. "Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id.* ("It is common sense that the relationship between a student and his teacher is very different from that between a citizen and the police. We do not ignore that reality.") (citing *Giles*, 554 U.S. at 376 (classifying "[s]tatements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment" as nontestimonial)).

## C.      Testimonial Inquiry into Statements Made in the Course of a SANE Exam

**{43}** Because the identity of the questioner is a relevant surrounding circumstance under *Bryant*, we next discuss the testimonial relevance of the identity of a SANE nurse as questioner and the testimonial context of a SANE exam. *See* 562 U.S. at 368-70 (noting that the identity of the interrogator "can illuminate" a primary-purpose assessment). Because the United States Supreme Court has not applied testimonial inquiry to statements made in the course of a SANE exam—*see State v. Burke*, 478 P.3d 1096, 1102 (Wash. 2021) (holding under the circumstances of a SANE "exam with both medical and forensic purposes" that "the primary purpose of nearly all of the statements [made in the course of the SANE exam] was to guide the provision of medical care, not to create an out-of-court substitute for trial testimony"), *cert. denied*, *Burke v. Washington*, 142 S. Ct. 182 (2021)—we analyze the testimonial relevance of the identity of a SANE nurse as questioner under New Mexico caselaw.

### 1.      The dual role of a SANE nurse and its testimonial implications

**{44}** We note at the outset that the complexity of testimonial analysis is further complicated by the "*dual* role" of a SANE nurse, which we have recognized in the hearsay context.[6] *See Mendez*, 2010-NMSC-044, ¶¶ 42, 46 n.5. This dual role consists

---

[6]We cite *Mendez*, a hearsay case, for its reasoning where relevant, while mindful of its admonition not to conflate "[t]he hearsay rule and the Confrontation Clause [as they] are not co-extensive and must remain distinct." 2010-NMSC-044, ¶ 28. The Court of Appeals was correct to recognize "the importance of separating these analyses in cases where both rules are implicated by the nature or source of the evidentiary material." *Tsosie*, A-1-CA-37791, mem. op. ¶ 7.

We disagree with the dissent's contention that this opinion conflates confrontation and hearsay analysis notwithstanding our statements otherwise. *See dissent* ¶¶ 164-65. To be sure, a statement may be

of "the provision of medical care and the collection and preservation of evidence." *Id.* ¶ 42. On the one hand, the medical care role includes a SANE nurse's professional "'role as a nurse, in a [medical care setting], performing a medical examination of a victim of a sexual assault.'" *Id.* ¶ 45 (quoting *United States v. Gonzalez*, 533 F.3d 1057, 1062 (9th Cir. 2008)). A SANE nurse under this medical care role retains their medical care role as a nurse generally, *cf. id.* ("SANE nurses regularly treat victims of sexual abuse that require critical medical attention."); accordingly, a SANE nurse's identity under this medical care role weighs toward a nontestimonial ruling, *see Giles*, 554 U.S. at 376 (classifying "statements to physicians in the course of receiving treatment" as nontestimonial). On the other hand, the SANE nurse's forensic role in "collecting and preserving evidence of value to the legal system," "[w]hen compared with [the roles of] other medical providers, . . . can [thus] seem more closely aligned with law enforcement," *Mendez*, 2010-NMSC-044, ¶ 42 (internal quotation marks and citation omitted), and accordingly a SANE nurse's identity under this forensic role weighs toward a testimonial ruling. *See Clark*, 576 U.S. at 249. As we have recognized, "SANE nurses . . . provid[e] critical treatment to patients at a time of great physical, emotional, and psychological vulnerability . . . [b]ut they also have special expertise in gathering evidence for subsequent prosecution of the offender, which raises appropriate concerns about whether the statement was made for the purposes of seeking medical care." *Mendez*, 2010-NMSC-044, ¶ 41.

**{45}** Since *Bryant*, our discussion in *Mendez* of a SANE nurse's dual role has been cited favorably by other jurisdictions. *E.g.*, *State v. Miller*, 264 P.3d 461, 487 (Kan. 2011) (applying the reasoning of *Mendez* to confrontation analysis where a SANE nurse's medical and forensic purposes "[o]ften . . . will require examination of individual questions and responses"). A SANE nurse's dual role has been otherwise recognized by additional courts in the confrontation context. *E.g.*, *Thompson v. State*, 2019 OK CR 3, ¶ 11, 438 P.3d 373 ("SANE nurses perform both a medical and investigatory function in almost every interaction with an alleged sexual assault victim.").

**{46}** In the confrontation context, New Mexico courts have implicitly recognized the dual role of a SANE nurse in two pre-*Bryant* cases, the precedential value of which we

---

admissible under both analyses where a statement in response to a question from a SANE nurse in her medical care role contains medically relevant information. Nonetheless, the two analyses are distinct even if the results coincide. "The touchstone of admissibility under Rule 11-803([4]) [NMRA] is the trustworthiness of each statement." *Mendez*, 2010-NMSC-044, ¶ 19 (heading). Admissibility under the Confrontation Clause, in contrast, requires that a statement's primary "purpose is not to create a record for trial," regardless of the statement's degree of trustworthiness. *Bryant*, 562 U.S. at 358; *cf. Crawford*, 541 U.S. at 51.

In applying Rule 11-803(4), trustworthiness sufficient for admissibility is predicated on the content of the statement, without regard to the primary purpose of the encounter. *Mendez*, 2010-NMSC-044, ¶¶ 29-31 ("Surrounding circumstances are certainly relevant, but the focus must center on the individual statement": "under Rule 11-803([4]), a declarant could make a statement for entirely medical purposes even if the primary purpose of the interview has become forensic. The converse is also true."). In applying confrontation analysis, however, admissibility is more contextual. *Bryant*, 562 U.S. at 360 ("An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment."). Stated differently, application of Rule 11-803(4) focuses primarily on "close[] examin[ation of] the *substance* of the statement," whereas under testimonial inquiry the content of the statement is only part of the analysis. *Mendez*, 2010-NMSC-044, ¶¶ 29-31.

discuss below. *Romero*, 2007-NMSC-013, and *State v. Ortega*, 2008-NMCA-001, 143 N.M. 261, 175 P.3d 929, *overruled on other grounds by Mendez*, 2010-NMSC-044, ¶ 1. The courts in both *Romero* and *Ortega* reached testimonial rulings based upon distinct forensic facts while in the process impliedly recognizing that the roles of a SANE nurse typically include both medical care and forensic purposes. *See Romero*, 2007-NMSC-013, ¶¶ 12-18; *Ortega*, 2008-NMCA-001, ¶¶ 19, 26, 32-33.

**{47}** In *Romero*, this Court affirmed the Court of Appeals' exclusion under the Confrontation Clause of narrative statements made by the victim when "asked to tell the SANE nurse what happened, so the SANE nurse would know how to proceed." 2007-NMSC-013, ¶¶ 16, 17. Prominent to the Court's testimonial ruling, the SANE exam in question "occurred several weeks after the assault" and with significant "assistance and encouragement" from law enforcement. *Id.* ¶ 17. We recognized there that the "victim's narrative" included portions that both "accuse[d the d]efendant of specific criminal acts" and were "relevant to medical treatment" or "could be viewed as relevant to seeking medical treatment." *Id.* ¶ 15. Impliedly, the challenged statements elicited by the SANE nurse potentially served both a forensic purpose and a medical care purpose. *See id.* ¶¶ 15, 17. Based on "[t]he [forensic] facts in th[e] record" regarding the elapsed time and the role of law enforcement, we rejected the state's argument that the primary purpose of the victim's statements was for the purposes of medical treatment. *Id.* ¶¶ 13, 17. Our recognition, despite those forensic facts that the challenged statements held potential medical relevance, impliedly points to "an examination by a SANE nurse" typically including a medical care purpose. *See id.* ¶¶ 14-15, 17.

**{48}** Our implicit recognition in *Romero* of the SANE nurse's medical care role is bolstered by three other points. First, we recognized there that "*Davis* confined its discussion of interrogation to situations involving law enforcement officers and their agents" and did not consider "'when statements made to someone other than law enforcement personnel are testimonial.'" *Romero*, 2007 NMSC-013, ¶ 7 (quoting *Davis*, 547 U.S. at 823 n.2). This recognition would have been immaterial had the *Romero* Court viewed a SANE nurse's identity as simply forensic or as an agent of law enforcement. Second, we recognized there that a SANE exam does not resemble the police interrogations envisioned by *Crawford*, as it "is not typically 'designed primarily to establish or prove some past fact, but to describe current circumstances requiring [medical] assistance.'" *Romero*, 2007 NMSC-013, ¶ 14 (quoting *Davis*, 547 U.S. at 827). Third, we agreed in *Romero* with the state that nontestimonial portions of the narrative could have survived redaction had the state advanced a proper basis for redaction of the testimonial portions. *Id.* ¶ 18; *see also Ortega*, 2008-NMCA-001, ¶ 23 (citing the *Romero* Court's "suggestion that medical portions might be separated from testimonial portions in the victim's narration").

**{49}** In *Ortega*, our Court of Appeals affirmed the district court's exclusion under the Confrontation Clause of statements transcribed in a SANE exam where the victim "was not provided medical treatment." *Id.* ¶ 5. Analogizing the forensic facts there to those in *Romero*, the *Ortega* Court described the SANE exam there as "nothing more than a description of the sexual abuse [the victim] suffered, with no medical purpose behind it." 2008-NMCA-001, ¶ 12. Additionally, the *Ortega* Court appears to have reached a legal

conclusion that a SANE exam is "[c]learly . . . geared for" and "exists in concert with" forensic purposes. *See id.* ¶ 21. However, *Ortega*'s discussion in support of that conclusion nonetheless identified several aspects of a SANE nurse's medical care role: (1) "first assess the victim's need for emergency medical care and ensure that serious injuries are treated," (2) possibly "treat medical conditions requiring immediate attention for a victim's safety," (3) possibly provide medications to the victim which are "prophylactic . . . for the prevention of sexually transmitted diseases . . . and other care needed as a result of the crime," and (4) provide medical treatment "relative to the patient being a victim of a sexual crime." *Id.* (omissions in original) (internal quotation marks and citation omitted). The Court also acknowledged that "cases [may] arise where identifying an offender or searching for physical evidence of sexual victimization" is "secondary to an overarching medical purpose in obtaining a victim's statement." *Id.* ¶ 34.

**{50}**     We conclude that the foregoing supports our recognition in *Mendez* of a SANE nurse's dual role, and we adopt this standard to guide a district court's analysis of SANE nurse testimony where applicable.

### 2.     The surrounding circumstance of a SANE nurse's identity may shift consistent with their dual role

**{51}**     The foregoing establishes that either of the dual roles of a SANE nurse may be present when eliciting an individual statement in the course of a typical SANE exam. Further complicating testimonial analysis, *which* of the dual roles is *more* present is likely to change multiple times over the course of a SANE exam, as a typical SANE exam is not partitioned into one medical care component and one forensic component. Under this reality, a court cannot indulge either testimonial or nontestimonial presumptions based on the identity of a SANE nurse regarding the primary purpose of statements made in the course of a SANE exam.

**{52}**     Regardless of which role is more present in eliciting an individual statement, the identity of a SANE nurse is merely one of the surrounding circumstances to be weighed by a district court and thus is not dispositive of the testimonial nature of the resulting statement. In mischaracterizing this opinion's logic as "circular," the dissent conflates a SANE nurse's *questions* with a declarant's *responses*. *See dissent* ¶ 163. We do not assert that "the statements Starr *elicits* [in her role] as a medical caregiver" are necessarily nontestimonial. *Id.* (emphasis added). To the contrary, we recognize that a responding statement may be testimonial notwithstanding the nontestimonial character of the question eliciting that statement where a SANE nurse is acting in their medical care role, as we discuss further below.

### 3.     Under *Davis*, district courts must redact testimonial portions of otherwise nontestimonial statements

**{53}**     Notwithstanding such complications, *Davis* made clear that district courts bear the responsibility to "recognize . . . point[s] at which, for Sixth Amendment purposes,

statements in response to interrogations" evolve or change in their testimonial nature. *Davis*, 547 U.S. at 828-29; *see also Bryant*, 562 U.S. at 365-66.

**{54}** We note that *Davis* and *Bryant* envisioned a clear point of demarcation at which the circumstance of law enforcement needing to resolve an emergency might end, thereby signaling a distinct transition from nontestimonial statements to testimonial statements. *See Davis*, 547 U.S. at 828-29; *Bryant*, 562 U.S. at 365-66. While, in contrast, the circumstance of a SANE nurse's identity pursuant to a dual role may shift multiple times within a SANE exam, the burden of determining that circumstance's proper weight within primary purpose analysis nonetheless remains with our district courts. *See Davis*, 547 U.S. at 828-29; *see also Mendez*, 2010-NMSC-044, ¶ 46. We agree with the Supreme Court of Kansas, quoting *Mendez*, 2010-NMSC-044, ¶ 46, in the confrontation context, that "New Mexico [district] courts must 'shoulder the heavy responsibility of sifting through statements, piece-by-piece, making individual decisions on each one.'" *Miller*, 264 P.3d at 487.

**{55}** We note also that, contrary to the dissent's reading, *dissent* ¶ 154, nothing in *Davis* supports the proposition that Sixth Amendment redaction by a district court is only proper where an encounter begins with a clearly *nontestimonial* primary purpose and then "evolves" into *testimonial* statements. *See Davis*, 547 U.S. at 828. To the contrary, *Davis*'s direct analogy of Sixth Amendment redaction to a district court's well-established role in redacting unduly prejudicial evidence counsels that such exercise may be proper regardless of whether the primary purpose of an encounter has evolved or shifted. *Id.* at 829. The fact that no such shift occurred in *Hammon* does not preclude the possibility that a nontestimonial purpose could arise even in such an encounter involving law enforcement, much less an encounter *not* involving law enforcement. *Cf. Clark*, 576 U.S. at 246.

**{56}** Concurrent with the foregoing responsibilities, a district court must also be vigilant that a SANE nurse's dual role is not used by the prosecution to end-run the Confrontation Clause by introducing SANE exam statements made for a testimonial primary purpose under the guise of having been made for a medical care primary purpose. This concern is heightened in cases where, as here, the SANE nurse is admitted as an expert witness and so could be "used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013) (describing other circuits' confrontation concerns regarding a testifying expert witness).

**{57}** District courts must be mindful of their role in preventing such potential abuses. A district court "has the prerogative to insist that all facts be presented that will insure a fair trial." *State v. Crump*, 1981-NMSC-134, ¶ 12, 97 N.M. 177, 637 P.2d 1232. If facts necessary for the testimonial inquiry are not elicited by direct examination or cross-examination during the admissibility hearing, "[t]he court may examine a witness" to complete the record. *See* Rule 11-614(B) NMRA; *State v. Paiz*, 1999-NMCA-104, ¶ 17, 127 N.M. 776, 987 P.2d 1163. Such material facts may include circumstances

surrounding the SANE exam or underlying purposes of individual questions that elicited challenged statements.

**{58}** In addition, as discussed above, *Bryant* directs that "standard rules of hearsay, designed to identify some statements as reliable, will be relevant." 562 U.S. at 358. It follows from this direction that a district court should be alert to considerations of a SANE nurse's testimony that raise credibility concerns, especially where such testimony is uncontradicted and is the sole evidence regarding the testimonial nature of an unavailable declarant's statements. Accordingly, we hold that a district court must articulate any credibility concerns regarding a SANE nurse's uncontradicted testimony where the district court determines that testimony regarding the SANE nurse's medical care role is pretextual in masking a forensic primary purpose. *See Medler v. Henry*, 1940-NMSC-028, ¶ 20, 44 N.M. 275, 101 P.2d 398 (rejecting uncontradicted testimony as allowable only under certain circumstances).

### 4. The precedential value of *Romero* and *Ortega*

**{59}** The State argues that the instant case is one of first impression, asserting that "there is no prior controlling New Mexico authority." The State argues that *Romero*, 2007-NMSC-013, and *Ortega*, 2008-NMCA-001, are distinguishable on their facts and that therefore the testimonial rulings in those cases do not direct the result here. The State specifically points to the SANE exam in this case "occur[ring] on the same night as the assault" and including medical treatment whereas, in *Romero*, "several weeks" elapsed between the assault and the SANE exam while, in *Ortega*, the SANE exam occurred four days after the initial physical examination and included no medical treatment. *See* 2007-NMSC-013, ¶ 17; 2008-NMCA-001, ¶¶ 4-5. In both prior cases, the State argues, "'any necessity for medical treatment as a result of the abuse had ended' by the time the [SANE] examination took place" (quoting *Ortega*, 2008-NMCA-001, ¶ 35), in contrast to the instant case.

**{60}** Defendant, while conceding some factual distinction, argues that *Romero* and *Ortega* nonetheless "provide the controlling legal analysis" by "apply[ing] the primary purpose test to statements made to a SANE nurse." Defendant argues that factual distinctions "do[] not prevent a court from reasonably and judiciously applying established legal principles." Defendant argues that the "more immediate" timing in this case "does not establish an overriding medical purpose," as "[i]t equally reflects a desire for prompt evidence gathering to avoid the spoliation of physical evidence and ensure an accurate memory of events." Defendant suggests that Declarant's statements here "'accus[ing] [D]efendant of specific criminal acts'" (quoting *Romero*, 2007-NMSC-013, ¶ 15), "are functionally indistinguishable from those in *Romero*."

**{61}** We hold that *Romero* is precedential for the instant case. We read *Romero* to abide with *Bryant* in "objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occur[red]." 562 U.S. at 370.

**{62}** In *Romero*, we applied *Crawford* and *Davis* to determine the testimonial nature of two narrative statements made in the course of the assault victim's SANE exam. 2007-NMSC-013, ¶¶ 1, 12. The facts central to our testimonial ruling on those statements included that (1) approximately three weeks elapsed between the assault and the SANE exam and (2) the SANE exam "occurred . . . with the assistance and encouragement" of law enforcement. *Romero*, 2007-NMSC-013, ¶¶ 2, 17 ("The facts underlying this appeal are stated clearly and thoroughly in the Court of Appeals' Opinion. We do not restate them." (citation omitted)); *State v. Romero*, 2006-NMCA-045, ¶¶ 53, 56, 139 N.M. 386, 133 P.3d 842.

**{63}** The statements in question were included within a larger narrative statement to the SANE nurse that "recounted the entire incident." *Romero*, 2006-NMCA-045, ¶ 59. We concluded that under the circumstances of the time elapsed between the assault and the SANE exam and of the degree of involvement of the law enforcement officer, "the portions of the victim's narrative specifically accusing Defendant of sexual assault and other charges should have been excluded." *Romero*, 2007-NMSC-013, ¶ 17. We further analogized the testimonial facts there as closer to the "after-the-fact inquiry" in *Hammon* than the "ongoing emergency" in *Davis*. *Id.* As previously discussed, "[w]e agree[d] with the [s]tate that redaction of [testimonial] portions of the narrative might have been appropriate" had the state "identified portions of the narrative that might have been likely candidates for redaction." *Id.* ¶ 18. In the absence of such a basis for specific redaction, however, we affirmed the Court of Appeals' exclusion of the entire narrative. *Id.*

**{64}** For these reasons, we conclude that *Romero*, 2007-NMSC-013, is precedential in applying the primary purpose test of *Davis* to statements made in the course of a SANE exam and in providing guidance for redaction of testimonial portions of such statements. Because of our conclusion, the instant case is not a matter of first impression, and thus we need not further address the precedential nature of *Ortega*. Accordingly, we also need not further consider the State's arguments regarding the persuasive value of other jurisdictions' cases concerning the issues before us.[7]

### 5. SANE exam statements do not require emergency or informality to be nontestimonial

**{65}** *Crawford*'s progeny have focused on the existence of an ongoing emergency as an important contextual circumstance that "focuses the participants on something other than 'proving past events potentially relevant to later criminal prosecution.'" *Bryant*, 562 U.S. at 361 (brackets omitted) (quoting *Davis*, 547 U.S. at 822); *see also Davis*, 547 U.S. at 826-28; *Bryant*, 562 U.S. at 361-66; *Clark*, 576 U.S. at 246-47. As discussed above, *Bryant* recognized that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." 562 U.S. at 358. We hold that where it centers

---

[7]We nevertheless recognize the weight of persuasive post-*Romero* authorities that have held statements made in the course of a SANE exam to be nontestimonial. *E.g. Burke*, 478 P.3d at 1102; *United States v. Barker*, 820 F.3d 167, 169-70, 172 (5th Cir. 2016); *Miller*, 264 P.3d at 490.

on the provision of medical care, a SANE exam similarly "focuses the participants on something other than 'proving past events potentially relevant to later criminal prosecution.'" *See id.* at 361 (brackets omitted) (quoting *Davis*, 547 U.S. at 822).[8]

{66}    We apply *Davis*, *Bryant*, and *Clark* in support of our conclusion. In each of those cases, nontestimonial statements given during an ongoing emergency included identification of defendants and accusations regarding specific criminal acts. *Davis*, 547 U.S. at 817-18, 822; *Bryant*, 562 U.S. at 349, 377-78; *Clark*, 576 U.S. at 241, 249. Clearly, then, the testimonial inquiry cannot turn simply on the content of the statements as relating to identification or accusations of criminal acts. Instead, these cases represent that the *focus or motive of the participants* is a relevant factor in determining whether the primary purpose of challenged statements was to "creat[e] an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358.

{67}    In the process of clarifying *Davis*, the *Bryant* Court recognized that a law enforcement officer's first responder responsibility correlates to the nontestimonial motive of responding to or resolving an emergency situation. *Cf.* 562 U.S. at 368. The *Bryant* Court also recognized that nontestimonial motives are likely to be present in victims in an emergency situation. *Id.* at 368-69.

{68}    The *Bryant* Court's recognition that an ongoing emergency can provide a nontestimonial focus for participants abides with *Davis*'s explanation of differences between the nontestimonial 911 call there and the testimonial station house interrogation in *Crawford*. *See Davis*, 547 U.S. at 827. The *Davis* participants' nontestimonial focus was bolstered by the informality of the situation, indicated by the victim's "frantic answers . . . in an environment that was not tranquil, or even safe." *Id.*; *see Bryant*, 562 U.S. at 366. These factors presumably contributed to the participants being focused on the emergency situation rather than on creating an out-of-court substitute for trial testimony.

{69}    Our conclusion regarding the possible nontestimonial focus of a SANE exam also abides with the proposition consistently supported by the United States Supreme Court in dicta, as noted by the Washington Supreme Court, "that statements made to medical providers for the purpose of obtaining treatment have a primary purpose that does not involve future prosecution and that such statements are therefore nontestimonial." *State v. Scanlan*, 445 P.3d 960, 967 (2019) (citing *Giles*, 554 U.S. at 376; *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647, 672 (2011) (Sotomayor, J., concurring in part)). It follows from this proposition that an encounter directed at the provision of medical care can focus the participants on something other than proving past events potentially relevant to later criminal prosecution. However, it does not follow that the factors necessary for participants' nontestimonial focus on medical care are the same as the factors necessary for participants' nontestimonial focus on emergency. Applying the reasoning in *Davis*, we

---

8The State's central argument for the challenged statements being nontestimonial is that "the primary purpose of [Starr's] examination was medical." Under this argument, we need not and do not address whether the unresolved medical issues facing a SANE examinee also constitute an ongoing emergency under *Davis* and *Bryant*.

hold that a significant factor for the former is whether the information sought was important to enable the provision of medical care. *See Davis*, 547 U.S. at 827. Where the objective circumstances demonstrate the information sought was indeed important in that regard, the focus of the participants is likely to have been on something other than creating an out-of-court substitute for trial testimony. We also recognize that, whereas formality in a law enforcement encounter may suggest a testimonial purpose, *Bryant*, 562 U.S. at 366, formality in a medical care encounter may enable the provision of medical care.

**{70}**    We recognize that *Clark* applied emergency and formality analysis to statements made to individuals who were not law enforcement officers. *See* 576 U.S. at 246-47. Such analysis was clearly warranted there, given the circumstances under which the victim's statements were made to his preschool teachers. However, *Clark* does not establish that those factors are dispositive, nor that they are required elements for a nontestimonial finding. *Clark* affirmed without reference to emergency or formality that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id.* at 249; *see United States v. Barker*, 820 F.3d 167, 172 (5th Cir. 2016) ("A nurse, unlike a police officer, is principally tasked with providing medical care, not 'uncovering and prosecuting criminal behavior.'" (quoting *Clark*, 576 U.S. at 249)). We agree with our Court of Appeals in the instant case that a SANE nurse, like the teachers in *Clark*, "is 'not principally charged with uncovering and prosecuting criminal behavior.'" *Tsosie*, A-1-CA-37791, mem. op. ¶ 15 (quoting *Clark*, 576 U.S. at 249).

**{71}**    Our holding abides with our recognition in *Romero* that a SANE exam, while not necessarily analogous to a 911 call, similarly "is not typically 'designed primarily to establish or prove some past fact, but to describe current circumstances requiring . . . assistance.'" 2007-NMSC-013, ¶ 14 (quoting *Davis*, 547 U.S. at 827). This recognition suggests the potential of a typical SANE exam to include participants' nontestimonial focus on the provision of medical care. As we have discussed, the *Romero* Court made this distinction while also recognizing that "*Davis* confined its discussion of interrogation to situations involving law enforcement officers and their agents." *Romero*, 2007-NMSC-013, ¶ 7. Because the testimonial facts in *Romero* cast doubt on whether medical care was actually provided in the SANE exam, the testimonial ruling in *Romero* does not conflict with our holding here.

**{72}**    In sum, we conclude that a declarant's statements to someone other than law enforcement do not require circumstances of ongoing emergency or informality to be nontestimonial if creating a record for future prosecution is not the primary purpose of the interaction. *Cf. Burke*, 478 P.3d at 1111 ("[W]hen declarants speak to someone other than law enforcement, there may be a multitude of purposes for the statements.").

## D.    Application

**{73}**    We next apply the foregoing to the facts of the instant case. In the course of our application, we address the parties' remaining arguments and the approaches of the

courts below. Objectively viewing the statements and actions of Declarant and Starr in light of the surrounding circumstances of the SANE exam, we hold as nontestimonial almost all of the challenged statements. On remand, those nontestimonial statements must still survive state and federal evidentiary considerations in order to be admissible at Defendant's trial.

**{74}** In its remaining argument, the State contends that the district court and the Court of Appeals improperly disregarded Starr's uncontradicted testimony regarding the SANE exam. The State contends that "[w]hen a court makes no finding that any part of a witness'[s] testimony is incredible and there is no other evidence, but then disregards that testimony, its decision is not supported by substantial evidence." Defendant contends that the courts below properly considered Starr's testimony.

**{75}** As required by *Bryant*, we begin our "highly context-dependent inquiry" with objective analysis of the circumstances in which the parties interacted, then conduct an objective and combined inquiry into the parties' statements and actions. *See* 562 U.S. at 363, 370. The relevant surrounding circumstances here include the time elapsed between the alleged assault and the SANE exam, the location of the SANE exam, the role of law enforcement in the SANE exam, and the identity of the SANE nurse as Starr's dual role bears on the challenged statements.

1. **The circumstance of the time elapsed between the alleged assault and the SANE exam**

**{76}** In this case, the close proximity in time of the SANE exam to the alleged predicate assault weighs toward a nontestimonial primary purpose. As we have discussed, the separation of the exam and assault events by several weeks in *Romero* and by several days in *Ortega* weighed significantly toward the testimonial rulings in those cases: the time elapsed suggested that any necessity for medical treatment pursuant to the assault had ended by the time of the SANE examination. *See* 2007-NMSC-013, ¶ 17; 2008-NMCA-001, ¶¶ 4-5. In contrast, the SANE exam here, on referral from UNMH, occurred in the same night as the alleged assault, thereby supporting the relevance of the exam to the provision of medical care. Starr testified that she assessed multiple considerations of Declarant's medical situation—including prophylaxis, safety plan, suicide assessment, and homicide assessment—that objectively suggest the relevance of recency of the assault to the medical purposes of the SANE exam.

**{77}** We agree with Defendant that the "more immediate" timing here compared to that in *Romero* is not dispositive of "an overriding medical purpose," as forensic goals are also served by gathering evidence promptly. Nonetheless, we conclude that the evidence regarding this timing circumstance supports the primary purpose of the SANE exam being nontestimonial.

## 2. The circumstance of the location of the SANE exam

**{78}**   The location of the SANE exam also weighs toward a nontestimonial primary purpose, as the clinic at the Family Advocacy Center is a setting conducive to providing trauma-informed medical treatment. Starr testified that SANE exams can be done in a hospital setting but that the clinic setting is "absolutely" better in allowing the examinee to "be really relaxed and comfortable" for the exam. While we agree with the district court's finding that "[t]he examination occurred in a structured setting," we recognize the medical care purposes that are served by the deliberate conditions of the clinical setting. As we have discussed, informality is not a requirement for a medical care purpose to weigh toward statements being nontestimonial.

**{79}**   The district court and the Court of Appeals noted Starr's testimony that the clinic "is located in the same building" as law enforcement "but in a separate area." Without more, however, we conclude that law enforcement's presence within a separate area of the same building does not dissipate the medical care relevance of the clinic location as a circumstance weighing toward the primary purpose of the SANE exam being nontestimonial.

## 3. The circumstance of law enforcement involvement in the SANE exam

**{80}**   Relatedly, the degree of involvement of law enforcement in the SANE exam here does not weigh toward a testimonial primary purpose. While it is noteworthy that Declarant was transported to the clinic by law enforcement, the record does not demonstrate significant further involvement to support Defendant's claim that "the statement was the product of an investigation by the authorities" "[involving] government officers" or that the "SANE interview [was] taken at police instigation."[9] Relevant to our analysis, Starr testified that law enforcement officers are not allowed in the SANE exam, that APD detectives are housed in a different area of the building, that SANE nurses "do not work for the police," and that the Family Advocacy Center is a "nonprofit and . . . separate" from the police. *See Mendez*, 2010-NMSC-044, ¶ 37 (stating in the hearsay context that "[a]bsent some evidence that the police were attempting to manipulate the [SANE] examination, we would not place dispositive weight on their presence on the premises or even in the examination room").

**{81}**   Also unpersuasive is Defendant's argument that law enforcement involvement is established by Declarant "having filed a police report and [having] authorized the release of evidence . . . to the police." Nothing in *Crawford* or its progeny supports the proposition that filing a police report can be viewed as a fact transforming the actions taken by a purported victim of sexual assault into testimonial actions. While consenting to the release of evidence to law enforcement is noteworthy, Starr testified that she conducts the SANE exam regardless of whether a patient wants to report to police. In addition, the release in question was one of two sections signed by Declarant in the

---

9We note that here Defendant's citations of *Crawford*, 541 U.S. at 56 n.7, and *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (plurality opinion) are inapposite. Both cases specifically considered police interrogations. In addition, as a pre-*Crawford* case, *Lilly*, 527 U.S. at 135, applied the *indicia of reliability* standard for confrontation under *Ohio v. Roberts*, 448 U.S. 56 (1980), which *Crawford* overturned.

SANE exam consent form, the other of which included his consent to multiple medical care and forensic components of the exam. Under *Bryant*'s objective test, the question for this circumstance is whether a reasonable declarant signing the two portions of the consent form would have understood that law enforcement was so involved in the SANE exam as to render the primary purpose of his statements to be the creation of evidence for Defendant's prosecution. *See Clark*, 576 U.S. at 245-46. Given the mixed nature of the matters consented to by Declarant therein, we disagree with Defendant that, due to his signed release, a reasonable person in Declarant's position would have known that his statements were testimonial in nature.

**{82}** In sum, we conclude that the level of involvement of law enforcement in the SANE exam here does not implicate the "assistance and encouragement" concerns recognized in *Romero*. *See* 2007-NMSC-013, ¶ 17.

### 4. The circumstance of the SANE nurse's identity as it bears on the challenged statements

**{83}** Because the SANE nurse's identity may shift between their dual roles during a SANE exam, we analyze Starr's identity in relation to the underlying purposes of each of the forms of the SANE exam which elicited the challenged statements. For this circumstance to weigh toward a testimonial primary purpose for an individual statement, the forensic purpose of the relevant SANE exam question must be more important than its medical care purpose, thus rendering Starr's forensic role greater than her medical care role regarding that question. *See Langham v. State*, 305 S.W.3d 568, 578-79 (Tex. Crim. App. 2010) ("It is . . . likely that, by 'primary purpose,' the Supreme Court [in *Davis*] meant to convey the purpose that is 'first' among all potentially competing purposes 'in rank or importance.'" (citing *Davis*, 547 U.S. at 822)). In this regard, the Court of Appeals correctly concluded that "Starr's identity as a SANE [nurse] . . . as it has particular relevance in this case" does not establish a presumption either toward testimonial or nontestimonial weight. *Tsosie*, A-1-CA-37791, mem. op. ¶ 15.

**{84}** Starr testified as to the purposes underlying each of the eight SANE exam forms that elicited the challenged statements. For each form, we consider Starr's testimony as relevant to determining what a reasonable SANE nurse's underlying purpose—and thus their role—would be for each of the SANE exam forms that elicited challenged statements.[10]

**{85}** First, regarding the *Consent Form*, Starr testified that, as discussed above, "the top part [of the form] is very much all about medical treatment," an intermediate paragraph acknowledges "that we shared [with Declarant] a notice of privacy," and the final part "is so that we can release this to law enforcement." She also testified that Declarant "signed for STI prevention [medical care] and photography [forensics] as well as talking about what happened and allowing me to do a basic medical assessment on him." The foregoing evidence indicates that, as regards the *Consent Form* as a whole,

---

10We note that the district court expressed no credibility concerns regarding Starr's testimony and that the record does not include contrary evidence for this analysis.

Starr's identity was informed as much or more by her medical care role than her forensic role, thus weighing more toward a nontestimonial ruling. As regards the law enforcement release portion alone, Starr's identity was forensic.

{86}   Second, regarding the *Sexual Assault Intake* form, Starr testified that its purpose is to "[g]et a basic medical background . . . [including] statistical data." She testified that the information obtained in the form is not different from that obtained in a typical intake form in a hospital. On cross-examination, Starr testified that the form's inclusion of the police report case number was relevant for the forensic purpose of cataloguing evidence properly. The foregoing evidence indicates that Starr's medical care role informed her identity regarding the *Sexual Assault Intake* form as much as or more than her forensic role, thus weighing more toward a nontestimonial ruling.

{87}   Third, regarding the *History* form, Starr testified that its purpose is "[m]edical":

> to know . . . [his] baseline, how a patient is, if they had any injuries or issues . . . prior to the assault that would affect how their body is, what medications they're on, how they're doing health-wise, . . . basic medical background stuff [including] [a]llergies to medications . . . [and] offer[ing] the tetanus shot . . . [and] the hepatitis B shot as well.

Starr testified that the *History* form's "Past Medical History/Surgeries" question is potentially relevant to her medical treatment, such as if signs or symptoms were to arise in relation to Declarant's reported seizure disorder or back injury. Starr testified that the *History* form's "Post-Assault Hygiene Activity" section is both medically relevant regarding a patient's ability to perform activities of daily living and forensically relevant regarding DNA evidence. Starr testified that the *History* form's "Offender Information" section is medically relevant to her risk assessment:

> It's very important, safety-wise, to know who was the offender. We're not looking so much for names, in general [beyond state domestic violence law requirements]. . . . [F]or our sexual assault [victims], we typically don't have the name. We want to know if the person who assaulted them has access to them again. . . . [W]e want our patients to be safe. That's standard medical care.

On cross-examination, Starr confirmed that she had asked Declarant whether Defendant was a household member. The foregoing evidence indicates that Starr's medical care role informed her identity regarding the *History* form as much as or more than her forensic role, thus weighing more toward a nontestimonial ruling.

{88}   Fourth, regarding the *Strangulation Documentation* form, Starr testified at length to its medical importance:

> Strangulation is a very specific kind of assault . . . [and] is very dangerous because it's . . . under-assessed medically. As a [non-SANE] nurse, I didn't learn about strangulation. Doctors are typically not trained around

strangulation. . . . And medically, it's very important because it's highly correlated to lethality.

Starr testified that, based on her specialized training in strangulation, the information regarding its method and manner was relevant to her treatment to "really assess the neck carefully" and to assess possible brain injury. Starr testified that her ability to assess injury resulting from strangulation is informed by "symptoms that the patient will report, and . . . signs that [the SANE nurse] can see, and we want to document both of those." It follows logically that in posing the questions in the *Strangulation Documentation* form that would elicit information regarding such symptoms and signs, Starr's medical care role informed her identity as much as or more than her forensic role. The evidence here weighs more toward a nontestimonial ruling.

**{89}**     Fifth, regarding the *Patient Narrative* form, Starr testified that it was medically necessary to learn "what happened to [Declarant], what happened to his body and how he felt, [and] how he's doing." Starr affirmed that the SANE exam medical history is not different from taking a general history at a general wellness visit, because "[w]e want to know . . . what the scenario was when patients are talking about their illness or their issues." The foregoing evidence indicates that Starr's medical care role informed her identity regarding the *Patient Narrative* form as much as or more than her forensic role, thus weighing more toward a nontestimonial ruling.

**{90}**     Sixth, regarding the *Acts Described by Patient* form, Starr testified that knowing "what went where" is important for medical purposes relating to prophylaxis and locations of injuries to treat, as well as for forensic purposes relating to locations to swab for evidence. Starr testified that ejaculation is medically relevant because "we're worried about illness, disease, [and] . . . cleanliness." The foregoing evidence indicates that Starr's medical care role informed her identity regarding the *Acts Described by Patient* form as much as or more than her forensic role, thus weighing more toward a nontestimonial ruling.

**{91}**     Seventh, regarding the *Physical Exam* form, Starr testified that "[t]his is a basic medical screen. We want to make sure that the patient is healthy, is safe to go home, [and] is otherwise medically stable" by assessing factors including blood pressure, pulse, and ketones. The foregoing evidence indicates that Starr's medical care role informed her identity regarding the *Physical Exam* form as much as or more than her forensic role, thus weighing more toward a nontestimonial ruling.

**{92}**     Eighth, regarding the *Body Map – Physical Exam/Assessment* form, Starr testified to the medical importance of its general descriptions to help assess the injuries she observed. We note that these descriptions appear to be largely Starr's statements of observation but include some statements from Declarant about those injuries. Starr testified that she treats injuries described in this form "if it's necessary." The foregoing evidence indicates that Starr's medical care role informed her identity regarding the *Body Map – Physical Exam/Assessment* form as much as or more than her forensic role, thus weighing more toward a nontestimonial ruling.

**{93}** In sum, Starr's testimony offers medical care purposes underlying each of the forms in the SANE exam that elicited the challenged statements. To the extent that the SANE exam questions reflect Starr's identity pursuant to her medical care role as a SANE nurse, we conclude that this circumstance weighs toward the challenged statements being nontestimonial.

### 5. Analysis of the surrounding circumstances by the district court and Court of Appeals

**{94}** The district court seemingly relied on a narrow reading of *Davis* and did not consider the implications of *Bryant* or *Clark*. Under such a reading, a court can easily and improperly infer that circumstances supporting a law enforcement officer's first responder role are requirements for a SANE nurse's medical care role. While both roles are focused on something other than creating an out-of-court substitute for trial testimony, conflating the factors attendant with these distinct roles results in a stunted analysis and reliance on presumptions.

**{95}** The district court's legal conclusions regarding the surrounding circumstances appear to have relied on presumptions that (1) emergency or informality is required for a nontestimonial primary purpose, whereas statements made outside of such circumstances are categorically testimonial where they refer to past events,[11] and (2) medical care that is duplicative of prior emergency care weighs toward a testimonial primary purpose.[12] To the extent that the district court did apply such presumptions, we clarify that they are improper, as discussed above. To the contrary, *Bryant* requires that the primary purpose test be applied objectively, considering "all of the relevant circumstances," without applying such presumptions. 562 U.S. at 360, 369-70. As to the majority of the challenged statements, the surrounding circumstances in this case support the conclusion that the SANE exam was motivated toward the provision of medical care as a primary purpose.

**{96}** We conclude that the Court of Appeals applied *Navarette*'s second confrontation principle to the surrounding circumstances to determine Declarant's *subjective* "level of understanding of the purpose of his statements to Starr," rather than applying an objective test. *Tsosie*, A-1-CA-37791, mem. op. ¶ 16 ("[W]e conclude that [Declarant] understood that at least some of his statements would be used to prosecute Defendant."). While *Bryant* expressly requires that the primary purpose test is an *objective* test, 562 U.S. at 360, we recognize that the second *Navarette* confrontation principle may appear to require otherwise. *See* 2013-NMSC-003, ¶ 8 ("[A] statement

---

[11]As discussed, the district court cited *Romero*, 2007-NMSC-013, ¶ 21, for the proposition that "the level of formality of the interrogation is a key factor" in testimonial analysis. This citation was taken from the *Romero* Court's discussion of the declarant's statements made to the responding *law enforcement officer*, *id.* ¶¶ 19-22, which followed its discussion regarding statements made to the *SANE nurse*, *id.* ¶¶ 12-18. *Romero* did not invoke formality in its primary purpose analysis of the statements made in the course of the SANE exam. *See id.* ¶¶ 12-18.

[12]The flaw of the second presumption is demonstrated, albeit anecdotally, by the facts in *Burke*, 478 P.3d at 1105, 1111, wherein the SANE nurse discovered a cervical laceration in the declarant that had not been discovered by the emergency department physician.

can only be testimonial if the declarant made the statement primarily intending to establish some fact with the understanding that the statement may be used in a criminal prosecution."). We read this principle in *Navarette* to fit within *Bryant*'s requirement of an objective and combined inquiry into the statements and actions of the participants. *See Bryant*, 562 U.S. at 360. We clarify that *Navarette*'s second confrontation principle cannot be applied to alter or reduce the requirements of the primary purpose test as provided in this opinion.

### 6.    Combined inquiry into the participants' statements and actions

**{97}**    In light of the foregoing analysis of the surrounding circumstances, we next analyze the statements and actions of Starr and Declarant to determine the testimonial nature of each of the challenged statements. The State contends that Declarant's statements are all nontestimonial based on the primary purpose of the examination being medical. Defendant contends that statements accusing Defendant of specific criminal acts are facially testimonial.

**{98}**    Without repeating our analysis, we incorporate our discussion of Starr's questions posed in the SANE exam forms as they related to the surrounding circumstance of her identity in her dual role as a SANE nurse. We reiterate that medical care purposes underlay each of the SANE exam forms that elicited the challenged statements. Logically, in the absence of contrary evidence, Starr's medical care role was more present in conveying those questions than was her forensic role. Accordingly, Starr's statements conveying those questions generally weigh toward a nontestimonial result, with the specific exception of the law enforcement release.

**{99}**    Evidence of Declarant's statements and actions in the SANE exam is limited to his responses as recorded by Starr in the SANE exam report. The majority of Declarant's responses to Starr's questions provided information that was important to guide the provision of medical care in relation to the medical care purposes of the particular questions. As *Davis* and *Bryant* demonstrate, statements that identify or accuse a defendant of specific criminal acts may nonetheless be rendered nontestimonial by virtue of a primary purpose that "focuses the participants on something other than 'proving past events potentially relevant to later criminal prosecution.'" *Bryant*, 562 U.S. at 361 (brackets omitted) (quoting *Davis*, 547 U.S. at 822). Declarant's statements within that scope are nontestimonial. A response by Declarant exceeding that scope became testimonial where it also identified Defendant or accused him of specific criminal acts. *See Romero*, 2007-NMSC-013, ¶¶ 15-17. We identify below those testimonial statements where they appear in each of the eight relevant SANE exam forms.

**{100}**  First, in the *Consent Form*, we hold to be testimonial only Declarant's consent to release records and evidence to law enforcement, for reasons previously discussed.

**{101}**  Second, in the *Sexual Assault Intake* form, we hold to be testimonial only Declarant's statement that Defendant "stole his phone." That statement is not important to the provision of medical care and is accusatory, presumably toward Defendant.

**{102}** Third, in the *History* form, we hold to be testimonial only Declarant's statement identifying Defendant as "Oliver." The alleged assailant's identity was important to the provision of medical care regarding his relationship and continued access to Declarant in order for Starr to complete her risk assessment. However, Starr testified that the scope of such information important to her risk assessment for Declarant did not include the perpetrator's name. This statement identifying and accusing Defendant is therefore testimonial. Apart from that statement, the statements within the *History* form, including the remaining statements in the *Offender Information* section, were within the scope of information important to guide Starr's provision of medical care.

**{103}** Fourth, in the *Strangulation Documentation* form, we hold all of the relevant statements to be nontestimonial. We recognize that Declarant's statements specifying the alleged method and manner of strangulation might be prejudicial, such as in specifying that Defendant used two hands and that his grip was "really strong." However, we also recognize that Starr logically would use such statements to guide her discovery and assessment of signs of strangulation, thus rendering the statements important to her provision of medical care. Because "every strangulation is different," Starr logically would rely on all such details to inform her assessment of Declarant's injury. Albeit a close call, we deem the method and manner statements to serve a medical care purpose more than a forensic purpose, thus rendering them nontestimonial. We also note that any prejudicial nature within such statements is a matter for the district court's post-confrontation analysis under Rule 11-403 NMRA.

**{104}** Fifth, in the *Patient Narrative* form, we hold the following statements to be testimonial as exceeding the scope of the medical care purposes underlying the form and as identifying Defendant or accusing him of specific criminal acts:

> I asked how they got in there. They said they crawled over the gate.
>
> The way they were saying things to me, trying to make me mad. Things like why don't I let them in, or take their calls. Asking about my "new boyfriend" I said he is just a friend, nothing going on.
>
> I went to the bedroom, then they both came into the bedroom and tied me up. They used a trash bag, they used a towel over my mouth so I wouldn't yell . . . They tied my feet too . . . Oliver . . . was trying to get his friend to take part, he just watched and held me down. (First and second omissions in original.)
>
> He took my clothes off, I noticed when I got up, I was naked, they stole my TV, DVD player, stereo system and my phone. I don't know what else they took.

Apart from those statements, the statements within the *Patient Narrative* form were nontestimonial as within the scope of information important to guide Starr's provision of medical care.

**{105}**  Sixth, in the *Acts Described by Patient* form, we hold all of the relevant statements to be nontestimonial as within the scope of information important to guide Starr's provision of medical care.

**{106}**  Seventh, in the *Physical Exam* form, we hold all of the relevant statements to be nontestimonial as within the scope of information important to guide Starr's provision of medical care.

**{107}**  Eighth, regarding the *Body Map – Physical Exam/Assessment* form, we hold all of the relevant statements to be nontestimonial. Declarant's statements included accusatory descriptions regarding particular injuries of "where he punched me" and "where I was tied." However, those descriptions also convey the nature of the injuries and thus are within the scope of information that was important to guide Starr's provision of medical care.

**7.      Analysis of the participants' statements and actions by the district court and Court of Appeals**

**{108}**  The district court appears to have attributed undue significance to Starr's testimony that she cannot "diagnose," concluding that "the majority of statements given [by Declarant] to the SANE nurse were not given for the primary purpose of medical diagnosis." The district court appears to have applied the well-established hearsay exception for medical diagnosis and treatment in calling on Rule 11-803(4) to define medical care as a nontestimonial purpose under the Confrontation Clause.

**{109}**  Placing Starr's relevant testimony in context, we take notice of her testimony on redirect examination distinguishing between her ability to make a limited *nursing diagnosis* and a physician's purview to make an official *medical diagnosis*. We discern no legal basis on which to conclude that the limited nature of a nursing diagnosis would render that diagnosis incapable of enabling the provision of medical care. Our research reveals no Confrontation Clause cases in which statements were excluded due to being relevant to a nursing diagnosis but not to a medical diagnosis. Even in the hearsay context, weighing the medical diagnosis and treatment exception therein, our research similarly reveals no cases in which statements were excluded due to being elicited in a nursing diagnosis. To the contrary, courts in multiple cases have accepted statements under the hearsay exception for medical diagnosis or treatment that were made within the scope of a nurse's limited ability to diagnose. *E.g.*, *Commonwealth v. Jennings*, 2008 PA Super 230, ¶ 16, 958 A.2d 536.

**{110}**  Concurrently, apart from her ability to *diagnose*, Starr's testimony included no such limitation on her ability to provide medical *treatment*. Her testimony includes multiple examples of Starr in fact providing medical treatment to Declarant——specifically, treatment related to physical trauma, sexually transmitted disease, and safety assessment. It follows reasonably that questions and answers related to such treatment were provided to assist in the provision of medical care at least as regards *treatment*, regardless of the precise definition of *diagnosis* applied.

Thus, any conclusion that Starr's provision of medical care did not meet the standard set by the hearsay exception for medical diagnosis or treatment is improper.

**{111}** Notwithstanding the foregoing, there is no obvious requirement in law for applying the hearsay exception for medical diagnosis or treatment to define the medical content standard for statements satisfying the Confrontation Clause. While we need not decide whether the two standards are identical, there is no basis for concluding that the standard for a SANE nurse's medical care role is narrower than that recognized under Rule 11-803(4). Therefore, we conclude that Starr's provision of treatment and nursing diagnosis—notwithstanding her statement regarding an inability to diagnose—constitutes medical care for the purposes of confrontation analysis. To the extent that the district court inferred some limitation on the relevance of Declarant's statements to Starr's provision of medical care in her dual role as a SANE nurse, we reject such an inference.

**{112}** The Court of Appeals gave testimonial weight to Declarant being "asked in detail about the assault during the examination, [and] asked to provide forensic genital and anal swabs." *Tsosie*, A-1-CA-37791, mem. op. ¶ 16. As we have discussed, information regarding details of a sexual assault can certainly fall within the scope of information that is important to guide the provision of medical care, and accordingly we do not agree that questions about the assault were necessarily testimonial. The issue is whether such questions were important to the SANE nurse's ability to provide medical care. We agree with the Court of Appeals that statements relating to the requested swabs were clearly for forensic purposes, but those statements were not among the statements sought by the State for use at trial.

**{113}** The Court of Appeals also appears to have applied a presumption that statements are testimonial if their content "identifies Defendant [or] accuses him of specific acts" or "focus[es] on past events rather than current symptoms." *Tsosie*, A-1-CA-37791, mem. op. ¶ 17. However, as we have discussed, *Bryant*'s context-dependent inquiry requires that the primary purpose test be applied objectively, considering "all of the relevant circumstances," without such presumptions. *See* 562 U.S. at 369-70. Under *Bryant*, the content of a statement does not alone determine its testimonial nature. *Id.*

## III.    CONCLUSION

**{114}** We conclude that the primary purpose of the majority of Declarant's statements made in the course of the SANE exam was nontestimonial, and thus admission of those nontestimonial statements at trial does not violate Defendant's constitutional right to confrontation. Accordingly, we reverse and remand to the district court for further proceedings consistent with this Court's opinion. We reiterate that testimonial inquiry merely establishes an analysis threshold for admissibility of Declarant's statements sought by the State for use at trial. Where a statement has been determined to be nontestimonial, "'the admissibility of [that] statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" *Clark*, 576. U.S. at 245 (quoting *Bryant*, 562 U.S. at 359).

**{115}  IT IS SO ORDERED.**

**C. SHANNON BACON, Chief Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Justice**

**JULIE J. VARGAS, Justice**

**MICHAEL E. VIGIL, Justice, dissenting**

**VIGIL, Justice (dissenting).**

**{116}**  In my opinion, the majority misapplies the "primary purpose" test to conclude that the entirety of the SANE examination report is nontestimonial under the Confrontation Clause of the Sixth Amendment to the United States Constitution. In arriving at its conclusion, the majority also ignores the "primary purpose" of the SANE report by looking only at individual parts of the report instead of the objective circumstances under which it was produced. Finally, viewed in its entirety, the majority opinion improperly equates the medical diagnosis or treatment exception to the hearsay rule with confrontation under the Sixth Amendment. Since I cannot agree with these conclusions, I respectfully dissent.

**{117}**  I conclude, for the reasons set forth herein, that the SANE examination report is testimonial and that its admission into evidence is barred by the Sixth Amendment. I therefore join several other courts in arriving at a similar conclusion. *See Hartsfield v. Commonwealth*, 277 S.W.3d 239, 244 (Ky. 2009) ("We believe their function of evidence gathering, combined with their close relationships with law enforcement, renders SANE nurses' interviews the functional equivalent of police questioning."); *see also Medina v. State*, 143 P.3d 471, 476 (Nev. 2006) (defining a SANE as a "police operative" because a SANE "gathers evidence for the prosecution for possible use in later prosecutions," thus leading "an objective witness to reasonably believe that the statements would be available for use at a later trial"); *see also State v. Cannon*, 254 S.W.3d 287, 305-06 (Tenn. 2008) (excluding statements of an unavailable witness previously made to a sexual assault nurse as testimonial because emergency room personnel had examined and stabilized that witness before the nurse conducted the structured interview). Courts that have declined to adopt a per se rule regarding the primary purpose of SANE examinations have still found that a SANE acted as a law enforcement agent when acting in her evidence-collecting role. *See, e.g., State v. Bennington*, 264 P.3d 440, 452, 455 (Kan. 2011) (explaining that the SANE asked a victim questions from a state-provided questionnaire as part of completion of the sexual assault evidence collection kit); *State v. Miller*, 264 P.3d 461, 488 (Kan. 2011) (same); *People v. Vargas*, 178 Cal. App. 4th 647, 662 (2009) (concluding that the SANE who examined a victim hours after an assault did so "for the primary purpose of documenting the nature of the sexual assault and gathering evidence for transmittal to the police and

for possible later use in court"); *State v. Hooper*, 176 P.3d 911, 917-18 (Idaho 2007) (determining several factors indicating that the examiner worked in concert with police); *Hernandez v. State*, 946 So. 2d 1270, 1280-83 (Fla. Dist. Ct. App. 2007) (concluding that the nurse's questions were the functional equivalent of police interrogation).[13]

## I.     THE PRIMARY PURPOSE TEST

**{118}**  The Confrontation Clause of the Sixth Amendment directs, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." When the state seeks to introduce "testimonial evidence" the Confrontation Clause "demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The command of the Confrontation Clause is "not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id*. at 61. While *Crawford* specifically declined to provide a comprehensive definition of "testimonial," it stated that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

**{119}**  Then, in *Davis v. Washington*, 547 U.S. 813 (2006), the United States Supreme Court elaborated on how to determine a statement's testimonial nature. The *Davis* Court recognized that comprehensively classifying testimonial statements was futile, and instead established the "primary purpose test":

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. By focusing on the "primary purpose" for the interrogation, the test recognizes that an interrogation is not necessarily limited to a single purpose, and when other contemporaneous purposes also exist, the "primary purpose" dominates. This test therefore requires a court to ascertain what the "primary purpose" for the interrogation is and not focus on any specific question or answer. This is supported by the use of the word "Statements" in the test. When the "primary purpose" for the interrogation is to establish or prove past events potentially relevant to a later criminal prosecution, *all* of the *statements* that result are deemed to be "testimonial." *Id.* There is no subsequent line-by-line or word-by-word assessment. Thus, the focus is on the "primary purpose of the interrogation" and not on any specific question or answer.

---

13The sources and parentheticals in this paragraph were compiled by Justice Gordon McCloud in her concurrence in *State v. Burke*, 478 P.3d 1096, 1121 n.8, 1123 (Wash. 2021) (Gordon McCloud, J., concurring).

**{120}** The *Davis* Court also insisted that the "primary purpose" determination must be made on an objective basis. *Id.* at 822. This was reiterated in *Michigan v. Bryant*, when the United States Supreme Court emphasized that an "objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose of the interrogation.'" 562 U.S. 344, 360 (2011). First, the circumstances under which the encounter occurs are "clearly matters of objective fact." *Id.* These include whether the encounter is at a crime scene or during an ongoing emergency or afterwards. Second, in conducting an objective analysis of the statements and actions of the parties, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* Stated in another way, a court makes this determination "by objectively evaluating the statements and actions of the parties to the encounter in light of the circumstances in which the interrogation occurs." *Id.* at 370.

**{121}** Encounters potentially producing testimonial statements are not limited to encounters with police officers. In *Davis*, statements were given in response to a 911 operator's questions. 547 U.S. at 817-18. The Court recognized that although not law enforcement officers themselves, 911 operators "may at least be agents of law enforcement when they conduct interrogations of 911 callers." *Id.* at 823 n.2. *Ohio v. Clark*, 576 U.S. 237, 240-41 (2015), addressed statements made by a three-year-old student to his teacher. The United States Supreme Court specifically declined to categorically exclude statements made to individuals who are not principally charged with uncovering and prosecuting criminal behavior, while noting that "such statements are less likely to be testimonial." *Id.* at 246.

**{122}** From this precedent, the following general principles emerge. First, if the "primary purpose" of the encounter is to identify a perpetrator or to "establish or prove past events potentially relevant to later criminal prosecution," then all of the statements produced during that encounter are testimonial under the Confrontation Clause. *Davis.* 547 U.S. at 822. The focus is on the primary purpose of the encounter and not on any individual statement. *Id.* Second, a proper assessment of the primary purpose of the encounter is viewed from the objective perspective of a reasonable participant *at the time of the encounter* and "not with the benefit of hindsight." *Bryant*, 562 U.S. at 360, 361 n.8.

## II.     APPLICATION OF THE PRIMARY PURPOSE TEST

**{123}** It is clear that the primary purpose of the SANE examination was forensic: to establish or prove facts relevant to a later criminal prosecution of Defendant. I arrive at this conclusion by objectively considering (1) the circumstances of the encounter, (2) Starr's objective purpose in conducting the examination, (3) Declarant's purpose in submitting to the examination, and (4) the formality of the examination.

## A. Circumstances of the Encounter

**{124}** Critical factors to objectively consider are the circumstances under which the encounter took place and whether the encounter was to address an emergency. The facts leading up to the SANE examination are as follows.

**{125}** On December 18, 2017, at approximately 8:00 p.m., Declarant went to his neighbor's home to contact 911. Law enforcement arrived about thirty minutes after the 911 call. Declarant told them that around 7:00 p.m. that night, Defendant and another man came to his apartment, and Defendant was angry, apparently because he believed that Declarant had a new boyfriend. Declarant said he was repeatedly punched in the face, kicked, choked, tied up, threatened with a knife, and penetrated in his mouth and anus by Defendant with his penis while the other man held him down. Before leaving, they stole his television, DVD player, stereo system, and phone. Declarant said he then went to his neighbor's home to contact 911 after he freed himself.

**{126}** Declarant initially refused medical attention after law enforcement arrived. Still, the officers suggested that the paramedics should be called to examine Declarant. Paramedics subsequently arrived at Declarant's apartment and treated him. Around 9:00 p.m. the paramedics transported Declarant to the University of New Mexico Hospital (UNMH). At UNMH, doctors and nurses examined and treated Declarant. He also received a CT scan apparently because he had a swollen eye.

**{127}** At 12:35 a.m., Detective Gomez asked Declarant, "I know you had talked to the officer about it but are you willing to see a sexual assault nurse?" Declarant responded, "Yes." The detective then asked, "Is that something you would like to do tonight?" Declarant said, "Okay." Around 2:25 a.m. a police officer asked Declarant to sign a document giving Albuquerque Police Department (APD) officers permission to search his apartment "for evidence, things that might pertain to this case." As Declarant signed that consent-to-search form, the officer stated, "We will get going to the Family Advocacy Center in just a moment, OK?"

**{128}** The APD officer then walked with Declarant out of UNMH to his squad car and drove Declarant to the Albuquerque SANE Collaborative at the Family Advocacy Center (Center). The Center is located in downtown Albuquerque at 625 Silver Avenue SW. Offices of APD detectives are in the same building. Gail Starr, a SANE, greeted the officer and Declarant inside. While riding in the elevator up to the examination rooms, Starr asked the officer if he knew which detectives were working on the case and if they were coming to the Center. Before leaving, the officer told Starr, "I will probably meet up with the detectives and see what else they need." The SANE examination started at approximately 3:00 a.m.

**{129}** Based on the foregoing facts, I conclude Declarant was not facing an ongoing emergency during his SANE examination. An "ongoing emergency" is an active threat at the time the statements are made. *See, e.g., Bryant*, 562 U.S. at 374 (contemplating an active shooter whose location and motivations were unknown during the interrogation). The closer the events of an alleged crime are to the statements describing the events,

the more likely there is an ongoing emergency. *See State v. Soliz*, 2009-NMCA-079, ¶ 20, 146 N.M. 616, 213 P.3d 520 (assessing "temporal proximity" to distinguish an ongoing threat from a past incident). For example, in *Hammon*—the companion case to *Davis*—the Indiana police responded to a "domestic disturbance" that had ended before their arrival. *Davis*, 547 U.S. at 819. Even though the attacker was still in the home, the victim and the attacker were separated during questioning, and the victim was in no present danger. *Id.* at 819-21. Because there was no ongoing emergency, the questioning was a criminal investigation.

**{130}** Here, there was no medical emergency. Declarant was able to untie himself and go to his neighbor to call 911 at around 8:00 p.m. Officers responded, and Declarant initially refused medical attention, but at the responding officer's suggestion, Declarant agreed, and the paramedics were contacted. They responded, treated him, and transported him to UNMH at around 9:00 p.m. Doctors and nurses at UNMH treated and released Declarant. The SANE examination commenced at 3:00 a.m. There is no indication at any time prior to his arrival for the SANE examination that there was a medical emergency of any sort, and the examination took place around eight hours after Declarant said he was assaulted, tied up, and robbed. Moreover, there is no suggestion whatsoever that Declarant was in any danger at the time of the SANE examination. At around 2:25 a.m. the day after the incident, a police officer transported Declarant from UNMH to the SANE Collaborative at the Center, which is located inside the same building on the same floor as APD detectives. Finally, Starr testified that SANEs are trained to be "very slow and careful with the patient" so that the patients are "really relaxed and comfortable in [the] space," spending at least two hours with a patient per examination.

## B.    Starr's Objective Purpose

**{131}** Starr's primary objective purpose in conducting the examination was forensic, which means "used in legal proceedings or in public discussions." *Webster's Third New International Dictionary of the English Language*, unabridged (1993) at 889. I begin with an overview of the role of SANEs, nationally and locally, in sexual assault investigations. Generally, to become a SANE, registered nurses must complete more than sixty hours of forensic, medical, and psychological training. New Mexico Coalition of Sexual Assault Programs (NMCSAP), *Roles and Responsibilities of a New Mexico SANE*, 1-2 (*Roles and Responsibilities*).[14] Together, this training covers assessment of injuries from sexual assaults, treatment for sexually transmitted diseases, forensic photography, fact and expert witness testimony skills, and crisis intervention training. *See* Julia Chapman, *Nursing the Truth: Developing a Framework for Admission of SANE Testimony Under the Medical Treatment Hearsay Exception and the Confrontation Clause*, 50 Am. Crim. L. Rev. 277, 280 (2013); *see also* Jennifer A. Ort, *The Sexual Assault Nurse Examiner*, 102 Am. J. Nursing 24, 24GG (2002). Nationally, the International Association of Forensic Nurses (IAFN) trains and oversees forensic assault nurses (or SANEs) for all fifty states. Almost 2,000 SANEs are certified by the

---

[14]Available at https://nmcsap.org/wp-content/uploads/Roles_Responsibilities_New_Mexico_SANE.pdf (last visited July 1, 2022).

IAFN in the United States. IAFN, *SANEs Trained and Certified by IAFN in 2020*;[15] *see* IAFN, Homepage.[16]

**{132}** The SANE Task Force and NMCSAP outline the qualifications for becoming a New Mexico SANE. *Roles and Responsibilities*, *supra*, at 2-4;[17] *see* NMCSAP, Homepage.[18] These required qualifications include current New Mexico Registered Nurse Licensure, a minimum of two years of nursing experience, completion of the SANE six-day didactic training, and proof of demonstrated competency. *Roles and Responsibilities*, *supra*, at 4.[19] Trainees are expected to obtain courtroom observation hours of violent crime, sexual assault, homicide, or domestic violence cases and to understand the chain of custody protocols for forensic evidence.[20]

**{133}** SANEs do not provide general medical diagnoses or care, nor are they first responders. Starr testified that she could not prescribe medications or diagnose or treat Declarant beyond the injuries associated with the alleged assault. Instead, SANE examinations involve a physical assessment of the victim that includes a forensic exam identifying and recording injuries specifically related to the alleged assault or rape. NMCSAP, Sexual Assault Evidence Kit (SAEK) Instructions (2005) at 1.[21] Photographs document visible injuries like bruises, lacerations, and other abrasions; the SAEK contains swabs and samples of specimens.[22] The SANE turns this evidence over to the appropriate law enforcement agency if the patient consents to the release of the records. SANE training objectively suggests a forensic purpose.

**{134}** With the foregoing background in mind, I turn to the location of the examination and its relationship to law enforcement. *See Bryant*, 562 U.S. at 360 ("An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose of the interrogation.' The circumstances in which an encounter occurs . . . are clearly matters of objective fact.") An APD officer drove Declarant from UNMH to the SANE Collaborative, which is located in the same building and on the same floor as APD detectives. This colocation of the examination objectively suggests a forensic purpose.

**{135}** Objectively, the circumstances surrounding the SANE examination are that there was no medical necessity for Declarant to see Starr. He first refused medical treatment and then agreed to medical attention at the suggestion of the police. The paramedics treated Declarant and took him to UNMH, where he was further treated and released.

---

15Available at https://rise.articulate.com/share/Dr3MMRtTTQoRrtQAc3iitqCEkaP-Ny2h#/lessons/9BtMW0qnH-XOW0y6E-1oIg9omDZ052KL (last visited July 1, 2022).

16Available at https://www.forensicnurses.org/ (last visited July 1, 2022).

17Available at https://nmcsap.org/wp-content/uploads/Roles_Responsibilities_New_Mexico_SANE.pdf (last visited July 1, 2022).

18Available at https://nmcsap.org/ (last visited July 1, 2022).

19Available at https://nmcsap.org/wp-content/uploads/Roles_Responsibilities_New_Mexico_SANE.pdf (last visited July 1, 2022).

20*Id.* at 2-4.

21Available at http://www.ncdsv.org/images/SexAssaultEvidenceKitInstructions.pdf (last visited July 1, 2022).

22*Id.* at 4-6.

The lack of a medical necessity suggests that the SANE examination was for forensic purposes.

**{136}** I now turn to the examination itself. Before the actual examination commenced, Declarant signed a form, the first page of the SANE examination report, giving "consent to release all records and evidence pertaining to this case to the pertinent law enforcement agency, Crime Victim Reparation Commission, Children, Youth, & Families Div., Adult Protective Services, District Attorney's Office & the APD Crime Lab." The examination report's second page, the *Sexual Assault Intake* form, notes both the name of the detective who responded to the sexual assault and the police report case number. This is consistent with Starr's testimony, "We work with the police."

**{137}** Starr's questions focused on recording and collecting forensic information. Declarant was asked to describe in detail the events before the attack began——who was involved, the beating, the sexual assaults, and the robbery——which Starr recorded verbatim as best she could. The narrative included that "offender" performed oral and anal copulation on Declarant with ejaculation inside Declarant's anus.

**{138}** An entire page of the SANE examination report is dedicated to information about the alleged perpetrator and past abuse. Here Starr noted that Defendant and Declarant "dated a month," Defendant "lived [with Declarant for] ~ 2 weeks," Defendant "was acting jealous," and Defendant was "stealing from [Declarant] before—why relationship ended." Further questions included, (1) "Does your abuser have access to a gun?" to which Declarant answered "no"; (2) "Has the violence increased in frequency/severity over the last year?" where Declarant's response was "first time"; (3) "Does your abuser use alcohol or drugs?" to both of which the response was "yes" noting "Meth"; (4) "Have you been strangled by your abuser in the last year?" where the response was "First time"; and (5) "Does your abuser have a mental illness?" where the response was "Think so."

**{139}** On a subsequent page with line sketches of human bodies, Starr placed numbers showing eighteen locations where she observed abrasions, bruises, swelling, cuts, pain, scratches, and redness that Declarant reported. The numbers were noted on the front, back, sides, head, and face of the body sketches similar to those on autopsy reports. Starr then explained each number in greater detail in the corresponding numbered text on the next sheet. Starr also examined Declarant's anus and documented a tear and skin tag at two locations on the anus in a diagram and description of the diagram. Starr took more than sixty photographs of the areas of Declarant's body she examined.

**{140}** As a result of her examination, Starr put together an SAEK. Starr's kit included Declarant's consent form, the undergarments he was wearing when he was sexually assaulted ("collected, air dried if necessary, and placed loosely in pre-labeled large brown bag"), air-dried oral swabs ("collected, air dried and two swabs placed in Oral envelope"), air-dried anal swabs ("collected, air dried and two swabs placed in Anal envelope"), skin swabs of hickeys, and photographs.

**{141}** Special instructions for the SAEK are checked as being followed by Starr. Those instructions require the following: "All small white envelopes sealed, taped, initialed, dated, and placed in the large white envelope along with Undergarments small brown bag, also stapled, taped, with integrity seal. Large white envelope sealed, taped, initialed, and dated with integrity seal. The information on the front labels of both the SAEK white envelope and large brown bag is completed and signed by Examiner. Chain of custody is maintained throughout." The SAEK was sealed with an integrity seal, affixed with the police report case number in accordance with evidence collection protocols, and given to the police along with the SANE examination report.

**{142}** We have previously observed, "When compared with other medical providers, the goals of SANE nurses and SANE examinations can seem more closely aligned with law enforcement . . . ." *State v. Mendez*, 2010-NMSC-044, ¶ 42, 148 N.M. 761, 242 P.3d 328. That is decidedly the case here. Starr said she spends at least two hours with a sexual assault patient. During that two hours, in contrast to all the forensic tasks she performed during the SANE examination, the only medical treatment Starr provided to Declarant was an ice pack for his swollen eye and prophylactic vaccinations. Taking all the circumstances together, I conclude that the *primary* purpose of Starr's SANE examination was to establish or prove past events potentially relevant to a subsequent criminal prosecution. That is *not* to suggest in any way that Starr would not treat any medical conditions she came across during the course of her examination. However, objectively observed, that was decidedly not her *primary* purpose.

### C.     The Declarant's Objective Purpose

**{143}** I now undertake what the facts show the Declarant's purpose was in submitting to the SANE examination. While there is no direct evidence as to what Declarant's purpose was, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter," but rather it is the purpose that a "reasonable participant[] would have had" in the same situation. *Bryant*, 562 U.S. at 360. I conclude that under the circumstances a reasonable participant would have understood that the process of collecting and preserving evidence was for a potential criminal case. *See Davis*, 547 U.S. at 822.

**{144}** First, we know that a detective spoke to Declarant at UNMH about seeing a SANE, and when he was later asked, he said he was willing to do so and assented to speaking to the SANE later that same night. We also know that a police officer asked Declarant to sign a form consenting to a search of his apartment for evidence, and as he signed the form, the officer said the police were going to get Declarant to the Center "in just a moment."

**{145}** Second, a law enforcement officer drove Declarant to the Family Advocacy Center, an "environment that focuses on the needs of victims of interpersonal crime,"[23]

---

23Available at https://www.cabq.gov/albuquerque-family-advocacy-center (last visited July 1, 2022).

which is colocated in the same building, and on the same floor, that houses APD detectives.

**{146}**  Third, before Starr began the examination, Declarant had to read and sign the SANE examination report's consent form that included a release of information to law enforcement, the APD crime lab, and the District Attorney's Office. Then, Declarant provided a detailed narrative about the assault, which prompted Starr to collect forensic genital and anal swabs as well as to identify on diagrams his alleged injuries and to take over sixty photographs of those alleged injuries. When Starr was asked if the purpose of taking certain swabs was to give them to the police, Starr agreed and added, "And it is to support the patient's desire to report this assault to the police."

**{147}**  Fourth, at the end of the examination, Starr provided Declarant with discharge instructions that included "Police Investigative Information." Since Declarant consented to reporting the alleged sexual assault, the discharge paperwork included instructions on how to launch an investigation into the alleged crimes, contact information for the APD, the designated contact agent, and the APD police report case number associated with the SAEK. While Starr testified, "We work with the police. We do not work for the police," the inclusion of law enforcement contact information would lead a reasonable participant to believe the evidence collected during the exam could serve an evidentiary purpose.

**{148}**  Thus, the objective circumstances of the exam would have alerted a reasonable participant to the potential future prosecutorial use of that participant's statements. The primary purpose of the examination was to create a record "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. For these reasons, Declarant's primary purpose in submitting to the SANE examination was to provide "testimony" supporting his allegations rather than to receive medical attention.

## D.     Formality of the Examination

**{149}**  The formality of the SANE examination weighs in favor of concluding that the SANE examination report is testimonial. Declarant was in a formal, safe, and tranquil environment during the examination. Formality "is a key factor in determining whether the statement is testimonial" and suggests the absence of an emergency. *State v. Romero*, 2007-NMSC-013, ¶ 21, 141 N.M. 403, 156 P.3d 694; *see Bryant*, 562 U.S. at 366, 377. Formality is a function of the location where the statement was made (for example, in a courthouse or at a crime scene) and the manner of recording (such as signing under oath or tape-recording). *Compare Crawford*, 541 U.S. at 38-39 (involving police interrogations at the police station), *with Bryant*, 562 U.S. at 349 (considering the statement of a gunshot victim in a parking lot).

**{150}**  The formalities and structure surrounding the SANE examination report are more than adequate to qualify the report—and Declarant's assertions within it—as testimonial. Declarant was questioned in a methodical, calm, and structured examination far-removed from harm. Declarant understood that evidence would be

collected during the SANE examination—and included in an SAEK—and still consented to the release of records to law enforcement agencies including the District Attorney's Office and the APD Crime Lab.

**{151}** Additionally, the method of recording Declarant's assertions emphasizes the examination's formality. The "core class" of testimonial statements exemplified in *Crawford*, 541 U.S. at 51-53, is not limited to sworn testimony alone. In *Bullcoming v. New Mexico*, 564 U.S. 647, 664 (2011), the United States Supreme Court reasoned that a "certified" unsworn report of the defendant's blood alcohol levels was testimonial hearsay because a "document created solely for an 'evidentiary purpose' . . . made in aid of a police investigation ranks as testimonial." (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009), for the laboratory report at issue). The *Bullcoming* Court used the following factors to support its conclusion: (1) law enforcement conveyed the evidence to the crime laboratory for testing, (2) a laboratory analyst tested the evidence and recorded the results in a "formalized" signed document, and (3) the formal report referred to court rules that provided for the document's admission into evidence. *Id.* at 665.

**{152}** Similarly, the SANE examination report's status as a formal statement stems from the process that created it, despite the absence of an official certification. The SANE examination occurred after police brought Declarant to the Center. Starr collected the forensic evidence and recorded medical and forensic information in the structured and uniform report. Starr was trained to know how evidence is admitted at trial through her SANE training. The report's "SAEK Checklist" also contains chain of custody protocols to be checked off as accomplished. When completed, the report and the SAEK were shared with APD.

**{153}** Further, Starr certified the validity of the SANE examination report and the information therein by initialing each page of the report and signing her name as a representative of the Albuquerque SANE Collaborative on the report's consent form, "Discharge Instructions," and SAEK Checklist. To *certify* is to "attest as being true." *Black's Law Dictionary* (11th ed. 2019) 284, 158 (defining *attest* as "[t]o bear witness; testify" or "[t]o affirm to be true or genuine; to authenticate by signing as a witness"). The SAEK Checklist emphasized the proper collection of evidence stating, "Examiner: The evidence you collect will be examined by either the New Mexico State Crime Lab or the Albuquerque Police Dept. Crime Lab. Accurate documentation provided in this Checklist significantly increases the value of the evidence collected should patient consent to investigation." Such formality suggests a forensic purpose.

## III.    THE MAJORITY OPINION

**{154}** The majority provides that because "a SANE nurse's identity pursuant to a dual role may shift multiple times within a SANE exam, the burden of determining [a] circumstance's proper weight within primary purpose analysis nonetheless remains with our district courts." *Maj. op.* ¶ 54. This statement reflects the primary flaw in the majority's reasoning. While it is true that district courts must shoulder the heavy responsibility of sifting through statements, piece-by-piece, making individual decisions

on each one, such sifting is done only after it has been concluded that the primary purpose of the encounter is something other than to establish or prove past events potentially relevant to later criminal prosecution. *See Davis*, 547 U.S. at 822, 828 (establishing that an interrogation to determine the need for emergency assistance can evolve into testimonial statements, but only after concluding the circumstances of the "interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency"). Rather than looking to the primary purpose of *the encounter*, the majority looks to *each statement* made, plus testimony made by Starr about the statements (testimony that was made after the encounter), to determine the primary purpose of each statement, and then extracts that information to determine the primary purpose of the encounter. This is incorrect. Moreover, if what the majority says in paragraph 55 is correct—that a district court may redact testimonial statements at any time, regardless of the primary purpose—it eviscerates the primary purpose test. In other words, simply go and redact any testimonial statements, as the majority does here.

**{155}**  The majority begins its analysis stating half of the rule for the primary purpose test, "we begin our 'highly context-dependent inquiry' with objective analysis of the circumstances in which the parties interacted, then conduct an objective and combined inquiry into the parties' statements and actions." *Maj. op.* ¶ 75 (quoting *Bryant*, 562 U.S. at 363). However, this Court must objectively evaluate "the statements and actions of the parties to the encounter, in light of the circumstances *in which the interrogation occurs*." *Bryant*, 562 U.S. at 370 (emphasis added). Further, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances *in which the encounter occurred*." *Id.* at 360 (emphasis added). The majority attempts to cloak its reliance on Starr's subsequent testimony and her subjective purpose as being "relevant to determining what a reasonable SANE nurse's underlying purpose" would be. *Maj. op.* ¶¶ 32 n.3, 84.

**{156}**  By examining the statements and actions and circumstances of the encounter, not testimony made subsequent to the encounter, this Court then determines if the primary purpose of the encounter is to establish or prove past events potentially relevant to later criminal prosecution. *See Bryant*, 562 U.S. at 357. If it is, there is no sifting or parsing through statements line-by-line. *See Davis*, 547 U.S. at 828-29. The entire SANE examination report is deemed testimonial and within the scope of the Confrontation Clause. *See id.* at 821-22 (holding that all the statements of an encounter are testimonial when the circumstances objectively indicate "that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"). Thus, this Court must look to the statements made and the actions and circumstances that occurred during the encounter, not statements from one of the participants made after the encounter on the "subjective or actual purpose" of the statements made and the actions that occurred during the encounter. *Bryant*, 562 U.S. at 360. This is where I believe the majority goes awry.

**{157}** The majority concludes that a SANE has dual roles under the examination's "medical care component" and its "forensic component." *Maj. op.* ¶ 51. The majority states that because a SANE's predominant role in an examination "is likely to change multiple times over the course of a SANE exam," a court cannot use a SANE's identity to *presume* either the testimonial or nontestimonial primary purpose of the *statements*. *Id.* Instead, according to the majority, Starr's identity as a SANE—and in a SANE's dual role in general—is informed by the underlying purpose of individual statements in the SANE examination. *See id.* ¶¶ 51, 83-93.

**{158}** So, the majority evaluates to what extent the nature of the questions from the SANE examination "informed" whether Starr was acting in a medical care role or a forensic role. *Id.* ¶¶ 85-93. To determine the primary purpose of a particular *statement*, the majority reasons that if the statement is relevant for a medical care component, then "Starr's medical care role informed her identity . . . as much as or more than her forensic role, thus weighing toward a nontestimonial ruling." *Id.* ¶ 86. In other words, the classification of a statement as either medical or forensic determines if Starr was acting in a "medical care role" or a "forensic role," thereby determining whether the statement is nontestimonial or testimonial. *Id.* ¶ 83.

**{159}** The majority concludes that each of the eight challenged examination forms "informed" Starr's medical care role more than her forensic role. *Id.* ¶¶ 85-93. The majority concludes, "To the extent that the SANE exam questions reflect Starr's identity pursuant to her medical care role . . . , we conclude that this circumstance weighs toward the challenged statements being nontestimonial." *Id.* ¶ 93. The release of records portion of the examination form is the only section relative to which the majority deems Starr's identity to be forensic. *Id.* ¶ 85.

**{160}** Later, the majority purports to engage in a combined analysis of the statements and actions of the participants——Starr and Declarant. *Id.* ¶¶ 97-107. The majority incorporates its "discussion of Starr's questions posed in the SANE exam forms as they related to the surrounding circumstance of her identity in her dual role as a SANE nurse." *Id.* ¶ 98. The majority concludes that Declarant's statements that "provided information that was important to guide the provision of medical care in relation to the medical care purposes of the particular questions" are nontestimonial. *Id.* ¶ 99. When Declarant's statements exceeded that scope, and identified Defendant or any criminal acts, the statements became testimonial. *See id.* Again, the majority evaluates Starr's testimony based on her stated subjective reasons for determining the purposes of her examination questions, rather than from a reasonable participant's perspective. *See id.* ¶¶ 102-07.

**{161}** The United States Supreme Court precedent evaluating the primary purpose of encounters with state actors is clear and remains unchanged since the creation of the primary purpose test. *See Davis*, 547 U.S. at 822. The analysis does not concern the subsidiary or corollary purpose of the SANE examination. *See id.* The case law addresses the SANE examination's *primary*, or fundamental, purpose. *See id.* Instead of evaluating the totality of an alleged sexual assault encounter, as prescribed by precedent, the majority opts to segment the encounter and task the district courts with

evaluating each utterance of the encounter. Further, the majority relies entirely on Starr's testimony to support its conclusions that the statements are nontestimonial. I determine the plain language and format of the SANE examination report alone, beginning with the *Sexual Assault Intake* form, to be sufficient as evidence of a testimonial primary purpose of the examination.

**{162}**  I strongly disagree with the majority's conclusion that the record does not demonstrate "significant" further involvement by law enforcement to support Declarant's claims. *See maj. op.* ¶ 80. Footage captured on the lapel videos and recorded interviews with APD demonstrates that Declarant first learned of SANE examinations from the officers, and the officers coordinated with Starr as to when the examination would be finished. This footage, combined with Declarant's signed release of records to the APD, is evidence a reasonable participant would have understood the depth of APD's involvement with the SANE examination and with this case.

**{163}**  I also determine that the majority's logic is circular in evaluating the relationship between a SANE's role and the testimonial nature of the statements. *See id.* ¶¶ 51, 83-93. The majority first establishes that statements that are made for the purpose of medical care or treatment are nontestimonial. *See id.* ¶ 69. Then, the majority says, a nontestimonial medical purpose informs Starr's medical caregiving role as a SANE. *See id.* ¶ 85. So, when Starr is acting as a medical provider, her purpose when asking Declarant questions during the exam cannot be to collect evidence for a forensic purpose. Since the statements Starr elicits as a medical caregiver do not have a primary purpose of producing testimonial statements, the reasoning goes, the statements are nontestimonial.

**{164}**  Finally, while the majority asserts it is not equating its medical diagnosis Confrontation Clause exception with the medical diagnosis or treatment exception for hearsay, *id.* ¶¶ 44 n.5, 108-13, the result it reaches belies that assertion. Rule 11-803(4) NMRA states, "A statement that (a) is made for—and is reasonably pertinent to— medical diagnosis or treatment, and (b) describes medical history, past or present symptoms, pain, or sensations, their inception, or their general cause," is "not excluded by the rule against hearsay."

**{165}**  In *Mendez*, we held that the "hearsay rule and the Confrontation Clause are not co-extensive and must remain distinct" when conducting Sixth Amendment testimonial analysis and considering the admissibility of statements. 2010-NMSC-044, ¶ 28. While the majority acknowledges this rule, *see maj. op.* ¶ 44 n.5, the majority proceeds to conclude that many of the statements made during the SANE examination are nontestimonial because they "were within the scope of information important to guide Starr's provision of medical care." *See maj. op.* ¶¶ 101-07. The majority's focus on the statements and whether they were important to guide Starr's "provision of medical care," rather than a focus on the primary purpose of the entire encounter, improperly meshes hearsay analysis under Rule 11-803(4) with Confrontation Clause analysis. *See maj. op.* ¶¶ 102-11; *see also Mendez*, 2010-NMSC-044, ¶ 21 ("[I]f a statement is pertinent to a medical condition, such that a medical care provider reasonably relies upon it in arriving at a diagnosis or treatment, the statement is deemed sufficiently

reliable to overcome hearsay concerns."). Further, the majority supports its reasoning by citing *Miller*, 264 P.3d at 487 (Kan. 2011), a case that erroneously applied our hearsay rules from *Mendez*, 2010-NMSC-004, ¶ 46, to its Confrontation Clause analysis, *see maj. op.* ¶ 45, and by using the hearsay exception to evaluate a SANE's dual role, *see maj. op.* ¶ 109. The majority overly relies on the hearsay analysis of Rule 11-803(4) in *Mendez* in direct contradiction of this Court's precedent.

## IV. CONCLUSION

**{166}** The *Crawford* Court described "'testimonial'" statements as "'solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact.'" 541 U.S. at 51 (quoting 2 N. Webster, *An American Dictionary of the English Language* (1828)). While the *Crawford* Court specifically declined to provide a comprehensive definition of *testimonial*, it created a nonexhaustive list of a "core class of 'testimonial' statements" which trigger Confrontation Clause concerns. *Id*. This core class includes "pretrial statements that declarants would reasonably expect to be used prosecutorially" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52.

**{167}** It is clear from the objective circumstances that the overarching primary purpose of the SANE examination was to establish past facts potentially relevant to Defendant's criminal prosecution. The core characteristic of SANE examinations is the collection and preservation of evidence irrespective of necessary medical treatment. A sexual assault victim with no apparent injuries will undergo examination and evidence collection procedures similar to those of a victim with injuries. *Compare State v. Ortega*, 2008-NMCA-001, ¶ 25, 143 N.M. 261, 175 P.3d 929 (explaining that a child never received medical treatment during the SANE examination), *overruled on other grounds by Mendez*, 2010-NMSC-044, ¶¶ 1, 40, *with Mendez*, 2010-NMSC-044, ¶¶ 1-9 (describing the SANE examination of a child who was bleeding vaginally following an alleged assault). SANEs are trained to follow the same procedures for each patient— notwithstanding a patient reporting the alleged assault to law enforcement. *See* SAEK Instructions, *supra*, at 2.[24] If a patient does not file a police report at the time of the SAEK collection, the SAEK will be stored as a "collected . . . but not reported" sexual assault kit which the patient may eventually choose to report. *See id.*[25]

**{168}** The primary purpose of the SANE examination was to collect and preserve statements and corroborating evidence for the purpose of proving Declarant's claims made to the police. The SANE examination report is therefore testimonial. Further, it is the only evidence the State has to prove its case against Defendant, and Defendant has never had an opportunity to confront and cross-examine Declarant who is deceased. The Sixth Amendment prohibits this result. Since the majority disagrees, I respectfully dissent.

---

[24]Available at http://www.ncdsv.org/images/SexAssaultEvidenceKitInstructions.pdf (last visited July 1, 2022).
[25]*Id.*

**MICHAEL E. VIGIL, JUSTICE**

## ORDER ON SUGGESTION OF DEATH AND MOTION
## TO ABATE OR APPOINT SUBSTITUTE PARTY

**BACON, Chief Justice.**

**{1}** WHEREAS, this matter came on for consideration by the Court upon the Appellate Defender's Suggestion of Death and Motion to Abate or Appoint Substitute Party ("the motion") pursuant to Rule 12-301 NMRA;

**{2}** WHEREAS, on July 14, 2022, this Court issued an opinion in *State v. Tsosie*, 2022-NMSC-017, ___ P.3d ___, resolving pretrial admissibility issues raised on interlocutory appeal by Plaintiff State of New Mexico concerning felony charges against Defendant Oliver Tsosie in *State v. Tsosie*, D-202-CR-2018-00597 (2d. Jud. Dist. Ct.);

**{3}** WHEREAS, on July 21, 2022, the motion before the Court informed us that Defendant had passed away on December 15, 2021, which assertion was later confirmed by the Office of the Medical Investigator of the State of New Mexico;

**{4}** WHEREAS, the circumstance of the death of a party in a case before this Court is governed by Rule 12-301(A) of our Rules of Appellate Procedure, which provides in pertinent part:

> If a party dies after notice of appeal is filed or while a proceeding is otherwise pending, the personal representative of the deceased party may be substituted as a party on motion filed in the appellate court by the representative or any other party. . . . If the deceased party has no representative, any party may suggest the death on the record and proceedings shall then be had *as the appellate court directs*.

(Emphasis added.)

**{5}** WHEREAS, the language in Rule 12-301 of "as the appellate court directs" has been interpreted by this Court in *State v. Salazar*, 1997-NMSC-044, ¶ 25, 123 N.M. 778, 945 P.2d 996, as "giv[ing a] court substantial discretion in determining how . . . a substitution should be conducted after death has been noted on the record";

**{6}** WHEREAS, the motion asks this Court to enter an order abating the proceeding to its inception (abatement ab initio) or substituting a party for Defendant;

**{7}** WHEREAS, the proposed remedy of abatement ab initio would vacate the opinion, whereas the proposed remedy of substitution of the deceased Defendant would leave the opinion in place;

**{8}** WHEREAS, the *Salazar* Court recognized that substitution of a deceased party may serve "the best interests of society" where the resulting nonvacated opinion "clarifies important issues involving the law . . . in New Mexico," 1997-NMSC-044, ¶ 27;

**{9}** WHEREAS, the opinion clarifies admissibility issues of first impression under the Confrontation Clause of the Sixth Amendment to the United States Constitution;

**{10}** WHEREAS, allowing substitution here involves no prejudice suffered by Defendant or his interests, *see Salazar*, 1997-NMSC-044, ¶ 27;

**{11}** WHEREAS, Defendant's death during pendency of the appeal had no effect on this Court's handling of the issues in the opinion, *see id.*;

**{12}** WHEREAS, abatement ab initio is "a court-created common law doctrine" applied by courts where a criminal "defendant's death . . . occurs while his criminal conviction is pending on *direct appeal*," *People v. Griffin*, 2014 CO 48, ¶ 4, 328 P.3d 91 (emphasis added), and is not applied where there has been no verdict at trial, *see Salazar*, 1997-NMSC-044, ¶ 30 (recognizing that substitution is not an available remedy where a criminal defendant "die[s] during pendency of discretionary *post-conviction* remedies," in which case "the petition will be dismissed as moot, and the verdict will stand" (emphasis added));

**{13}** WHEREAS, the issues in the opinion satisfy both of our well-established exceptions to mootness, said issues being "of substantial public interest, and . . . capable of repetition yet evad[ing] review." *Jones v. N.M. Dep't of Pub. Safety*, 2020-NMSC-013, ¶ 30, 470 P.3d 252 (internal quotation marks and citation omitted);

**{14}** WHEREAS, the Court having considered the foregoing and having determined pursuant to Rule 12-301(A) and *Salazar*, 1997-NMSC-044, that substituting a party for Defendant serves the best interests of society; Chief Justice C. Shannon Bacon, Justice David K. Thomson, and Justice Julie J. Vargas concurring; Justice Michael E. Vigil dissenting;

**{15}** NOW, THEREFORE, IT IS ORDERED that the motion to substitute a party for Defendant is GRANTED;

**{16}** IT IS FURTHER ORDERED that we appoint defense counsel of record as Defendant's substitute for the remainder of the proceeding.

**{17}  IT IS SO ORDERED.**

**C. SHANNON BACON, Chief Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Justice**

**JULIE J. VARGAS, Justice**

**MICHAEL E. VIGIL, Justice, dissenting**

**VIGIL, Justice (dissenting).**

**{18}**   On July 14, 2022, this Court issued an opinion in this criminal case, ordering a remand to the district court for further proceedings. One week later, appellate counsel for Defendant filed a suggestion of death, stating she learned that Defendant had passed away, while the case was pending, on December 15, 2021. Counsel asked this Court to enter an order abating the proceeding or substituting a party for Defendant. I respectfully submit that abatement is proper. Since the majority disagrees, I dissent.

**{19}**   There has never been a trial in this case. The alleged victim is deceased. Prior to trial, the district court entered an order excluding from evidence certain statements made by the alleged victim to a Sexual Assault Nurse Examiner (SANE) on grounds that its admission would violate Defendant's confrontation rights under the Sixth Amendment to the United States Constitution. The State exercised its right to pursue an interlocutory appeal under NMSA 1978, Section 39-3-3(B)(2) (1972). The Court of Appeals affirmed the district court, and after granting certiorari, we issued our opinion reversing the Court of Appeals and remanding the case to the district court for further proceedings.

**{20}**   As matters stand, the alleged victim and Defendant are both deceased. With no alleged victim and no defendant, there is no case. The appeal is absolutely moot. *See Gunaji v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008 ("A case is moot when no actual controversy exists, and the court cannot grant actual relief." (internal quotation marks and citations omitted)). Furthermore, as matters stand, if the opinion is not withdrawn, we leave in place a purely advisory opinion. *See City of Las Cruces v. El Paso Elec. Co.*, 1998-NMSC-006, ¶ 18, 124 N.M. 640, 954 P.2d 72 ("We avoid rendering advisory opinions.") In addition, by substituting another party for the deceased Defendant, this Court effectively cuts off and prevents any further review of its opinion. The United States Supreme Court will not grant certiorari in a criminal case when the defendant has died. *See Dove v. United States*, 423 U.S. 325 (1976) (dismissing the petition for certiorari review because the petitioner died).

**{21}**   The general rule is that "the prosecution abates from the inception of the case upon death of a criminal defendant." *State v. Salazar*, 1997-NMSC-044, ¶ 20, 123 N.M. 778, 945 P.2d 996. I recognize that Rule 12-301(A) NMRA states in part that when the death of a party is suggested on the record, "proceedings shall then be had as the appellate court directs." Exercising this discretion, *Salazar* modified, but did not abrogate, the general rule. *Salazar* only excluded from the general rule cases where the defendant dies while exercising the constitutional right to a direct appeal as a matter of right following a conviction. *Salazar*, 1997-NMSC-044, ¶ 30 ("This holding applies only to cases involving the death of a defendant who possesses a direct appeal as of right to a criminal conviction."); *see also* N.M. Const. art. VI, § 2 (providing a right of appeal from a sentence of death or life imprisonment). The case is now before us on a discretionary grant of certiorari, and not as a matter of right. *Salazar* does not apply. Because the direct appeal as of right requirement is not satisfied in this case, the

general rule of abatement ab initio applies. The lack of any conviction weighs heavily in favor of applying the general rule of abatement ab initio, and I do not see any good reason for exercising our discretion to issue an advisory opinion in a case that is moot. Respectfully, asserting that the opinion addresses an issue of first impression is not, by itself, sufficient.

**{22}**　I respectfully submit that the appropriate course in this case is to withdraw the opinion and remand the case to the district court to abate the entire proceeding ab initio. Since the majority disagrees, I dissent.

**MICHAEL E. VIGIL, Justice**